# REDACTED OPINION

# In the United States Court of Federal Claims

Nos. 15-876C; 15-923C
Filed: December 15, 2015
Redacted Version Issued for Publication: March 25, 2016[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **CONSTELLATION WEST, INC.** | * | |
| **and SEV1TECH, INC.,** | * | **Post-Award Bid Protest; Motion for** |
| | * | **Judgment on the Administrative** |
| **Protestors,** | * | **Record; Unstated Criteria; Waiver** |
| | * | **of Informalities and Minor** |
| **v.** | * | **Irregularities; FAR 52.215-1(f)(3);** |
| | * | **Clarifications; FAR 15.306(a)(2);** |
| **UNITED STATES,** | * | **Unequal Treatment.** |
| | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * * * * * | * | |

**Ralph C. Thomas III**, Barton Baker Thomas & Tolle, LLP, McLean, Virginia for protestor Constellation West, Inc.

**Shlomo D. Katz**, Brown Rudnick, LLP, Washington DC for protestor Sev1Tech, Inc. Of counsel was **Aidan Delgado**, Brown Rudnick, LLP, Washington, DC.

**Eric J. Singley** and **James R. Sweet**, Trial Attorneys, Commercial Litigation Branch, Department of Justice, Washington, DC for defendant. With them were **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, Department of Justice, Washington, D.C. Of Counsel were **William P. Rayel**, Senior Trial Counsel, Commercial Litigation Branch, Department of Justice, Washington, D.C. and **Gregory A. Moritz**, Assistant General Counsel, Defense Intelligence Agency.

**O P I N I O N**

<u>**HORN, J.**</u>

---

[1] This opinion was issued under seal on December 15, 2015. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with some of the redactions that the parties proposed in response to the court's request, as well as additional redactions that the court views as proper. Words which are redacted are reflected with the following notation: "[redacted]."

**FINDINGS OF FACT**

The two above captioned cases are post-award bid protests arising from the same solicitation issued by the Defense Intelligence Agency (DIA). Protestor Constellation West, Inc. (Constellation West), in case number 15-876C, is a Nebraska corporation headquartered in Bellevue, Nebraska, that provides Information Technology (IT) support and solutions. Protestor Sev1Tech, Inc. (Sev1Tech), in case number 15-923C, is a Virginia corporation headquartered in Woodbridge, Virginia, that also provides IT support and solutions. DIA received seventy-five proposals for the solicitation, twenty-six for the full and open track and forty-nine for the small business track, including proposals from Constellation West and Sev1Tech. On July 15, 2015, the Source Selection Authority (SSA) stated in his Source Selection Decision Document that DIA had determined twenty-five offerors to the small business track represented the "best overall value" to the government based on the analysis and recommendations of the Source Selection Advisory Council (SSAC), which were attached to the Source Selection Decision Document, and that contract awards should, therefore, be made to those offerors. The twenty-five offerors did not include Constellation West or Sev1Tech. On July 17, 2015, DIA issued award notices to the twenty-five successful offerors. All twenty-five of the awardees subsequently signed contracts with DIA. Of the twenty-four disappointed offerors to the small business track, six filed protests in this court, all assigned to the undersigned. After a hearing and after the administrative record was filed, four of these protests, in case numbers 15-832C, 15-877C, 15-916C, and 15-922C, were voluntarily dismissed by the protestors, leaving only the two above captioned protests.

<u>The Solicitation</u>

The solicitation at issue, number HHM402-14-R-0002, allowed offerors the opportunity to join DIA's Enhanced Solutions for the Information Technology Enterprise (E-SITE) contract vehicle. According to the solicitation, the E-SITE contract is intended to "establish the acquisition framework for delivering the full scope of information technology services and capabilities to support the DIA, the Combatant Commands (CCMDs), the Military Services intelligence needs, and partner agency worldwide missions across the Intelligence Community (IC)." The E-SITE contract is intended to do so by creating a "contract vehicle that provides participating organizations with comprehensive Information Technology (IT) technical support services leveraging a mix of large and small business primes and subcontractors to satisfy the participating organizations' mission requirements." Specifically, the solicitation created an Indefinite Delivery/Indefinite Quantity (ID/IQ) contract vehicle that will allow E-SITE awardee contractors to propose solutions for task orders issued by the participating agencies. Task orders will be competed among E-SITE contractors, although some task orders may be set-aside for small businesses. The E-SITE contract is intended to replace DIA's current Solutions for the Information Enterprise (SITE) contract. The ID/IQ contract's ordering period consists of one base year and four one year options. The maximum amount that may be awarded to any E-SITE contractor is $6,000,000,000.00, and the minimum guaranteed amount is $500.00.

The original E-SITE solicitation was issued on March 18, 2014 and the final amended version of the solicitation on May 6, 2014. Awards under the solicitation were to be made to those offerors whose proposals were determined by DIA to represent the best value to the federal government. The solicitation created two separate "Evaluation Tracks" for awards: full and open awards and awards reserved for small business in accordance with Federal Acquisition Regulations (FAR) 19.502-4(a) (2015). Both protestors were evaluated under the small business track. Offerors who submitted proposals under the small business track were evaluated based on price and three non-price factors: Past Performance; Management/Technical; and Security/Supply Chain Risk Management. Offerors who submitted proposals under the full and open track were evaluated under these same factors, as well as an additional Small Business Participation Factor. The non-price factors included sub-factors that represented specific characteristics of the solicitation's objectives. The ratings on which proposals would ultimately be evaluated, however, were to be assigned at the factor level only. Price was to be evaluated for completeness and reasonableness in accordance with FAR 15.404-1 (2015). The Security/Supply Chain Risk Management Factor was to be evaluated on a pass/fail basis and was not to be considered in the best-value analysis. The other non-price factors (Past Performance and Management/Technical), when combined, were to be significantly more important than price in determining which proposals represented the best value. Both the Past Performance and Management/Technical Factors were to be assigned an overall adjectival/color rating.

The evaluation of individual areas within these Factors included the determination of significant strengths, strengths, weaknesses, significant weaknesses, and areas that meet the standard. A "Strength" was defined in the solicitation as "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." A "Significant Strength" was defined as "an aspect of an offeror's proposal that has appreciable merit or appreciably exceeds specified performance or capability requirements in a way that will be appreciably advantageous to the Government during contract performance." A "Weakness" was defined as "a flaw in the proposal that increases the risk of unsuccessful contract performance." A "Significant Weakness" was defined as "a flaw [in the proposal] that appreciably increases the risk of unsuccessful contract performance." "Meets the Standard" was defined as "an aspect of the proposal which does not constitute a strength, weakness, or deficiency." Each volume of the proposal, Past Performance, Management/Technical, Security/Supply Chain Risk Management, and Price, was required to "be written on a stand-alone basis, so that its contents can be evaluated with no cross-referencing to other volumes." The solicitation further stated that "[i]nformation required for proposal evaluation that is not found in its designated volume may result in unfavorable proposal evaluation."

The Past Performance Factor evaluated offerors' performance as either a prime contractor or a subcontractor on complex IT-related efforts, which were completed within the last three years or on-going at the time of the solicitation. An overall adjectival/color rating was assigned for Past Performance based on the following rating table:

| Color | Rating | Description |
|-------|--------|-------------|

| Blue | Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
|------|------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Purple | Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Green | Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| Red | No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |
| White | Unknown Confidence (Neutral) | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

(emphasis in original).

For the Management/Technical Factor, offerors were to be assigned an overall adjectival/color rating based on two sub-factors, listed in descending order of importance: (1) Management Experience and Expertise (Section M-3.2.1 of the solicitation) and (2) Technical Experience and Expertise mapped to functional areas in the Statement of Work (SOW) (Section M-3.2.2 of the solicitation). For the Management Experience and Expertise Sub-factor, offerors were to provide "evidence of, and the Government will evaluate, the depth and breadth of their team's experience and details of their team's expertise on similar on-going and completed projects (as a prime or a subcontractor) with respect to areas defined" in four sub-paragraphs. The first of these sub-paragraphs (Section M-3.2.1.1 of the solicitation) stated, in relevant part:

1. IC Wide Transition and Integration Efforts:

The offeror shall provide evidence of their in-depth understanding and ability to support current/projected IC wide transition and integration efforts (e.g. Intelligence Community Information Technology Enterprise (IC ITE), Joint Information Environment (JIE). . .) and their ability to apply new and emerging technologies/capabilities in the following demonstration areas.

\*\*\*

e. Capacity planning approaches.

(first ellipsis in original). The second sub-paragraph under the Management Experience and Expertise Sub-factor (Section M-3.2.1.2 of the solicitation) stated:

2. <u>Achieving strategic outcomes</u>:

      a. Effecting positive change on a customer's operating model and systems by understanding their needs, forecasting industry and the customer's future, and then transitioning them into a better state

***

      e. Provisioning services using a managed service delivery model, quantitative and qualitative key performance indicators, established service levels, quality assurance reviews, and performance management corrections

Sub-factor 2 of the Management/Technical Factor, Technical Experience and Expertise mapped to functional areas listed in the SOW, required offerors to:

      provide evidence of the depth and breadth of their team's experience and details of their team's expertise on on-going and completed projects (as a prime or a subcontractor) with respect to all areas under SOW 3.2. The seven functional areas (3 digit paragraphs) are comparatively equal to each other in importance. The 4 digit subparagraphs within the functional areas are comparatively equal to each other in importance.

The SOW was included as a part of the solicitation. Among the seven functional areas under SOW 3.2, portions of two areas are relevant to the two protests currently before the court: "ENTERPRISE COMPUTING, STORAGE, SHARE AND FIELD SERVICES" (SOW 3.2.4) and "CYBERSECURITY AND INFORMATION ASSURANCE SERVICES" (SOW 3.2.6). (capitalization in original). The ninth sub-paragraph of SOW 3.2.4 (SOW 3.2.4.9), titled, "Enterprise Operations, Event Monitoring and Management, Performance Monitoring, and Analysis," states:

      The Contractor shall provide services to establish Enterprise operations, event monitoring and management, performance monitoring, and analysis services. These services provide centralized operations, monitoring, management and analysis of enterprise applications, systems, and core services as well as infrastructure assets to include file servers, email servers, application servers, web servers, and storage from all enterprise service providers 365 days a year, 24 hours per day, 7 days per week. Services include, but are not limited to, monitoring established thresholds, responding to warning and alert messages from the monitoring systems, coordinating corrective action once thresholds are reached to prevent issues from re-occurring, and providing initial troubleshooting to restore services as quickly as possible. Other services include providing feeds to the Enterprise watch and other government designated watch centers as directed for situational awareness, responding to escalated incidents and outages (e.g., from the service desk), taking corrective actions to resolve the issue, escalating issues that cannot be resolved within the network

5

operations center, and maintaining/upgrading the supporting network infrastructure and services.

The twelfth sub-paragraph of SOW 3.2.4 (SOW 3.2.4.12), titled "Enterprise Data Backup, Disaster Recovery (DR), and Continuity of Operations (COOP) Operations and Support," states:

> The Contractor shall provide support for planning, execution and management of Enterprise data backup, disaster recovery (DR), and continuity of operations (COOP) operations and support. Services include, but are not limited to, ensuring Enterprise data backup, DR, and COOP requirements are considered early in the application or systems' development lifecycle; verifying Enterprise data backup, DR, and COOP capabilities during installation; certifying Enterprise data backup, DR, and COOP compliant architectures; creating and executing recurring Enterprise data backup, DR, and COOP scenarios to test and verify continued capabilities; and reporting lessons learned and process improvements.

Although the solicitation does not define the term "enterprise," an April 27, 2015 Memorandum for Record (MFR), titled "Management/Technical Evaluation Process" and prepared by the chairman of the Source Selection Evaluation Board (SSEB) responsible for evaluating the elements of the Management/Technical Factor, states that, with regard to SOW 3.2.4.8 through SOW 3.2.4.12, DIA evaluators "considered whether the Offeror identified DIA Enterprise equivalent experience." The MFR further states that:

> For purposes of this evaluation the SSEB notes the current DIA Enterprise is approximately:
>
> - 20,000 DIA / 45,000 DoDIIS [Department of Defense Intelligence Information System] / 250,000 IC [Intelligence Community] user base,
> - 25 security domains across Unclassified/Secret/Top Secret,
> - 5 major world-wide datacenter hubs, and
> - 15 regional data centers,
> - 550 customer sites[,]
> - 900,000 line items of equipment in hardware asset inventory.

The other functional area under SOW 3.2 relevant to protestor Constellation West, SOW 3.2.6, states:

> The Contractor shall provide diverse Cybersecurity and Information Assurance (IA) services that enforce, comply with, and support the DoD and IC cybersecurity and IA security directives, policies and procedures. Cybersecurity and IA include a wide-range of technical, functional, and managerial services necessary to ensure the secure operation of systems. Cybersecurity and IA services include, but are not limited to, policy development; security technical assessment; insider threat assessment;

6

security architecture development; security engineering; certification and accreditation; security compliance (such as ICD 503 and ICD 705, DoDI 8500 IA controls and other relevant DoD and IC policies). IA training management in accordance with DoDD 8570.1, audit, assessment, and reporting services; Computer Network Defense Service Provider (CNDSP) and inspection services IAW DoDD 8530.1, Chairman of the Joint Chief of Staff Instructions (CJCSI) 6510.01E and CJCSM 6510.01; vulnerability assessment and management; metrics consolidation and reporting (to include the Federal Information Security Management Act (FISMA) requirements); computer network defense (CND) operations, monitoring, and analysis; cybersecurity and IT systems and tools administration and maintenance; incident response, tracking, and resolution; cross-domain solutions support; inter-agency coordination; and PKI [Public Key Infrastructure] procedures and guidance. Specific cybersecurity and IA requirements and services will be identified in the individual task orders.

The April 27, 2015 MFR, titled "Management/Technical Evaluation Process," noted that "[f]or purposes of evaluations, the SOW element 3.2.6 was broken up into components." According to the April 27, 2015 MFR, those components were:

- SOW 3.2.6.1 Policy Development; Security compliance (policies ICD 503/705, DOD 8500); Certification and accreditation

- SOW 3.2.6.2 Security technical assessment; Insider threat assessment

- SOW 3.2.6.3 Security architecture development; Security engineering

- SOW 3.2.6.4 IA training management (DoDD 8570.1 audit/assessment/reporting)

- SOW 3.2.6.5 Computer Network Defense Service Provider (CNDSP) & inspection services (DoD 8530.1 (CJCSI) 6510.01E, and CJCSM 6510.01)

- SOW 3.2.6.6 Vulnerability assessment and management; Metrics consolidation and reporting (FISMA) [Federal Information Security Management Act]

- SOW 3.2.6.7 Computer Network Defense (CND) operations, monitoring, analysis

- SOW 3.2.6.8 Cybersecurity and IT systems and tools admin and maintenance

- SOW 3.2.6.9 Incident response/tracking/resolution; inter-agency coordination

- SOW 3.2.6.10 PKI procedures and guidance

- SOW 3.2.6.11 Cross-domain solutions support

The Management/Technical Factor was to be assigned an overall rating according to a different rating table than the one used for the Past Performance Factor.  The rating table, which was contained in the solicitation at Section M-3.2.3, was as follows:

| Color | Rating | Description |
|---|---|---|
| **Blue** | **Outstanding** | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| **Purple** | **Good** | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| **Green** | **Acceptable** | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| **Yellow** | **Marginal** | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful performance is high. |
| **Red** | **Unacceptable** | Proposal does not meet requirements and contains one or more deficiencies. Proposal is unawardable. |

(emphasis in original).

With respect to price, proposals were to be assigned a single total price based on ceiling labor rates offerors specified for various labor categories offerors filled in a spreadsheet provided with the solicitation. The spreadsheet required offerors to provide ceiling rates for various labor categories based on the level of skill required, from "Simple" (Level 0) to "Exceptionally Complex, Inter-Discipline, Inter-Organizational" (Level 4), the year of performance, i.e., whether performance occurs during the base year or in one of the four option years in the E-SITE contract, and the geographic location of performance. The spreadsheet identified seven geographic locations within the United States, referred to as a Groups 1 through 7, and six overseas locations, Germany, the United Kingdom, Iraq and Afghanistan, Seoul, South Korea, Qatar, and Tokyo, Japan. The spreadsheet

used shading to identify specific cells for which binding ceiling prices were not required. DIA's goals for this pricing structure were described in the E-SITE "Acquisition Plan," dated June 17, 2013, which stated:

> As the E-SITE contract will provide ceiling labor rates for many of the common IT labor categories, price will be a consideration, but will not be the most important factor. The capability or performance goals will be of greater importance than price during the source selection. The price competition will continue at the task order level when the E-SITE prime contractors will have the opportunity to revise their labor rates downward in the actual task order proposals.
>
> ***
>
> E-SITE will introduce significant competition at the task order level, thereby driving competitive pricing. In addition, E-SITE will have labor rates negotiated up front to ensure competitive pricing over the course of the contract.

The solicitation described the process of how a proposal's total price would be arrived at and how it would be evaluated, as follows:

### M-6 PRICE

A. The proposed ceiling labor rates (See Section B) will be evaluated for their completeness and reasonableness in accordance with FAR 15.404. Price realism or cost realism of proposed prices will not be evaluated.

B. All option year pricing will be considered in the evaluation.

C. Price analysis - The offeror's proposed ceiling labor rates will be multiplied against a predetermined and undisclosed quantity of hours determined by the Government for each labor category to arrive at a total evaluated price. This evaluation includes the base year and all option years and a total sum will be calculated.

**NOTE:** The Government will NOT disclose the "predetermined and undisclosed quantity of hours".

D. The predetermined and undisclosed quantity of hours used in the price analysis is a representative labor mix of historical work performed on the SITE contract.

E. The total price will be used in the Best Value Trade-Off Analysis supporting the final Source Selection.

(emphasis and capitalization in original).

The instructions offerors were to follow in submitting the price portion of their proposals were contained in Section L of the solicitation, which stated:

**L-4.5 Volume V – Price**

A. The offeror must ensure that all aspects of the Section M, Price pertaining to the solicitation are addressed. The offeror's price proposal must adhere to the provisions of this Volume.

B. Offerors must submit the Price Volume as described herein. Provide only the information requested. Proper presentation, organization, and clarity, as well as adequate supporting documentation, must be provided to facilitate Government evaluation of the proposal.

C. The offeror's proposed price will be subject to evaluation for reasonableness and completeness. Information in the Price Volume that pertains to other volumes will not be evaluated.

D. The Government will use Microsoft Office 2007 Excel for evaluation and analysis of the pricing section of the Price Volume.

E. The Price Volume must include the ceiling rates for the base period and all proposed options per the spreadsheet found in Section J, Attachment 2. Ceiling rates apply to both prime and sub-contractor labor. Minor rounding errors are acceptable. Offerors should ensure the spreadsheet is complete (ceiling prices), but should not alter the basic format of this spreadsheet (columns, rows, font, etc.). The instructions for information to be captured are contained within the spreadsheet itself. All proposed ceiling rates shall be for labor support at a Government location only.

(emphasis in original). DIA also incorporated the following "Question & Answer" related to pricing into the solicitation via an April 16, 2014 amendment:

[Question:] Is offeror required to provide the ceiling rates for all group [sic] for all labor categories or just for the group within its physical location and labor categories available?

[Answer:] L-4.5 C answers your question. We require all pricing for completeness.

The solicitation stated that DIA "intend[ed] to award the contract without discussions with offerors," but that "[i]n accordance with FAR 15.306(a), Offerors may be given the opportunity to clarify certain aspects of their proposal or to resolve minor or clerical errors." The solicitation indicated that proposals would be due in two deliveries, with the volumes discussing the Past Performance and Security/Supply Chain Risk Management factors due April 17 or 18, 2014 and the volumes discussing the Management/Technical factor and price due May 15 or 16, 2014.

The process by which proposals were to be evaluated and awardees chosen was laid out in a revised Source Selection Plan, dated January 30, 2015. The revised Source Selection Plan established separate SSEBs for each of the evaluation factors. Proposals were to be initially evaluated by the individual members of each SSEB based on the evaluation criteria for their factor. Each SSEB was to then agree to one group evaluation report for each proposal based on the consensus of the findings of the individual evaluators and assign a rating for their evaluation factor. The SSEBs' evaluation reports were to be presented to the SSAC, which would review the results to ensure the evaluation process followed the evaluation criteria and prepare a comparative analysis and recommendations to the SSA. The SSA would then make the best-value decision and document the rationale for the decision in a Source Selection Decision Document.

## Constellation West

Protestor Constellation West timely submitted the first set of volumes of its proposal on April 18, 2014, and the second set of volumes on May 16, 2014. DIA, acting through the SSEBs, assigned Constellation West a Satisfactory Confidence (purple) rating for the Past Performance Factor, a Marginal (yellow) rating for the Management/Technical Factor, and a Pass (green) rating for the Security/ Supply Chain Risk Management Factor. Constellation West's total evaluated price was $[redacted]. The chairman of the Management/Technical SSEB summarized the SSEB's reasons for assigning a Marginal (yellow) grade for the Management/Technical portion of Constellation West's proposal, as well those of several other offerors', in an April 27, 2015 MFR titled "Past Performance Evaluations and Management/Technical Evaluation Rating Differences." The MFR states:

> The Management/Technical Yellow rating was because the Offerors' proposals:
>
> i.  lacked detailed depth and breadth of experience for completed and/or on-going projects for some element components;
>
> ii.  lacked detailed experience on DIA Enterprise scale projects for some element components; and
>
> iii.  lacked an approach and detailed experience for completed and/or on-going projects for some element components.

DIA's rationale for rejecting Constellation West's proposal was laid out in the SSAC's July 15, 2015 revised award recommendation report, on which the SSA based his award decisions. According to the SSAC, although Constellation West's Past Performance Factor was "comparative to a majority of those Offerors recommended for award" and its total evaluated price was "competitive" and "lower than all but eleven (11) of the proposals recommended for award," Constellation West's proposal did not represent the best value to the government "due to its significant and other weaknesses" under the Management/Technical Factor. According to the SSAC:

Constellation West's Management/Technical proposal is inferior to the proposals of all the Offerors recommended for award. Constellation West'[s] Management/Technical proposal does not demonstrate adequate experience and expertise to meet the E-SITE SOW requirements and the risk of unsuccessful performance is too high to warrant award. In coming to its award recommendations the SSAC considered that the Management/Technical Factor was the most important of all Non-Price Factors. Under Sub-Factor 1, the most important of the two Sub-factors within the Management/Technical Factor, the SSAC concludes that the two strengths identified for Constellation West with regard to management of personnel is [sic] clearly outweighed by the five weaknesses relating to IC Wide Transition and Integration Efforts, Achieving Strategic Outcomes, and Management of Transitions. Furthermore under Sub-Factor 2, the SSAC concludes that thirteen strengths (there were no significant strengths) identified by the SSEP[2] are outweighed by the six significant and twenty-one other weaknesses. The SSAC carefully read each of the strengths and weakness identified by the SSEP and has concluded that the risks of unsuccessful performance as depicted by the findings under Management/Technical Factor are too high to warrant award notwithstanding the findings under the Past Performance Factor and lower price as compared to the majority of the Offerors recommended for award.

The SSEB for the Management/Technical Factor assigned Constellation West's proposal no significant strengths, fifteen strengths, twenty six weaknesses, six significant weaknesses, and twenty nine meets the standards. As noted in the SSAC's report, two strengths, five weaknesses and eleven meets the standards were assigned under Management/Technical Sub-factor 1, Management Experience and Expertise, and thirteen strengths, six significant weaknesses, twenty one weaknesses, and eighteen meets the standards under Management/Technical Sub-factor 2, Technical Experience and Expertise mapped to functional areas listed in the SOW. Constellation West now challenges the six significant weaknesses and nine of the weaknesses assigned under the Management/Technical Factor: two weaknesses assigned under elements of Sub-factor 1, M-3.2.1.1e and M-3.2.1.2e; and six significant weaknesses and seven weaknesses assigned under elements of Sub-factor 2, SOW 3.2.4.9, SOW 3.2.4.12, and SOW 3.2.6.

The SSEB assigned one weakness based on Section M-3.2.1.1e, on the grounds that "[t]he Offeror's proposal lacks detailed information on a number of components within capacity planning approaches. The Offeror's proposal lacks description of capacity planning that includes monitoring trends of capacity usage and projecting capacity requirements to stay ahead of demand."

The SSEB assigned a second weakness based on Section M-3.2.1.2e, but did so using language contained in Section M-3.2.1.2a of the solicitation, an area for which it

---

[2] The SSAC's report refers to the Source Selection Evaluation Boards (SSEBs) as Source Selection Evaluation Panels (SSEPs).

had assigned Constellation West a meets the standard. Specifically, the SSEB stated in its evaluation that:

> The Offeror's proposal lacks detailed information on a number of components within this area. There is a distinct lack of information regarding the understanding of needs forecasting of industry and customer's future needs, and how to transition the customer to a better state.

The SSEB assigned two weaknesses under SOW 3.2.4.9 and SOW 3.2.4.12 based on Constellation West's failure to provide evidence of relevant "enterprise" level experience. With respect to SOW 3.2.4.9, the SSEB stated in its evaluation that:

> The Offeror's proposal describes experience performing operations, monitoring, and analysis of something less than enterprise level support.

> The Offeror's proposal, page 75, cites: ". . . [redacted] ([redacted]%) of TCW [Team Constellation West] [personnel] has enterprise operations, event and performance monitoring, event management, and analysis experience for the IC-DOD enterprise. . .".

> The Offeror's proposal, pages 75-77, cites: ". . . TCW has demonstrated its approach to enterprise operations, event monitoring and management, performance monitoring, and analysis on the Advanced Server Management Program for IRS [Internal Revenue Service]. . . TCW prime contractor Constellation West provided continuous, 24x7x365 monitoring and management of customer operating systems, incident management and escalation including IT security coordination and execution of maintenance tasks in the customer's infrastructure utilizing ITIL® change management processes . . . TCW prime contractor Constellation West provided remote management of 3,000+ servers using BMC products for event management and incident management via warning and alert notifications . . . TCW performed monitoring, troubleshooting, and patch management support for MS Operating System (OS) server performance and VMware ESX Host platforms . . . TCW provided 24/7/365 enterprise support for the IRS. When personnel are not on-site, they are called and within 1 hour of notification begin incident response . . . TCW prime contractor Constellation West delivered multiple escalation options, including when a Level 2 support person identified that a change to a configuration item was necessary to resolve the incident. Additional escalation levels include 'under investigation' when an incident has not been resolved within 48hrs or SLA [Service Level Agreement] time frame. . .".

(omissions and second alteration in original). With respect to SOW 3.2.4.12, the SSEB stated in its evaluation that:

The Offeror's proposal describes experience implementing data backup, disaster recovery (DR), and continuity of operations plan (COOP) at less than an enterprise in accordance with SOW 3.2.4.12.

The Offeror's proposal, page 80, cites: ". . . [redacted] ([redacted]%) of TCW companies provide COOP, DR, operations for federal customers. Constellation West outlined the COOP/DR plan for USSTRATCOM [United States Strategic Command] and provides COOP/DR support to USSTRATCOM, USAF [United States Air Force], VA [Department of Veterans Affairs], EPA [Environmental Protection Agency], and USDA [United States Department of Agriculture]. IT Contingency Planning is an element in a larger Continuity Planning Program that includes Contingency Planning and DR, BIA [Business Impact Analysis] and Testing of Consulting in COOP, DR, and Contingency Plans. TCW has extensive experience supporting federal Continuity Programs, including developing and testing Contingency and DR Plans and integrating them into a synergistic framework with other contingency capabilities to protect agencies from natural, technological, and human risks. Given the criticality of IC missions, TCW understands the importance of ensuring that DIA can effectively recover and restore its IT systems to full operational status if they are disrupted for any reason using standardized and comprehensive DR/COOP policies and guidelines consistent with industry best practices. Integrating backup DR/COOP planning into the SDLC [Software Development Life Cycle] process reduces risks and costs by assuring that these requirements are built into the solution from the start. TCW has demonstrated support for planning, execution and management of enterprise data backup, DR, and COOP operations and support services . . .".

The Offeror's proposal, page 81, cites: ". . . DHS [Department of Homeland Security] – Constellation West led the initial SIEM fielding operations and support at US-CERT [United States Computer Emergency Readiness Team] and NSD [National Security Deployment (division)]. Product selection for DR/COOP was decided after understanding the requirements, capabilities and limitations of the end users. Subsequent configuration allowed the key performance parameters and SLAs to be met for the collection, storage and reviewing of events in the unlikely event of a manager shutdown or loss of primary process location . . . DHS/DoD – For US-CERT and DARPA [Defense Advanced Research Projects Agency] Constellation West utilized VMWARE's snapshots and VMOTION for both DR and Continuity of Operations. All functional testing took place in the development network on resources dedicated to development and staging prior to activation into operations . . . DHS/DoD – At USSTRATCOM, AFWA [Air Force Weather Agency], USDA, and EPA, Constellation West verified DR/COOP and backup functions in the operating environment were accomplished as part of the monthly maintenance cycle and integrated into other periodic requirements to minimally disrupt operations. If, during daily operations a system failed, we would restore files from backup. Care was

taken to restore resources while any issues or discrepancies documented into the knowledge base for facilitating lessons learned . . . DHS/DoD – TCW developed lessons learned for exercises and operational activation of backup/recovery and DR/COOP processes. Our knowledge gained from documenting successes and failures is presented in the knowledge base and incident/ticket management system . . .".

(omissions in original).

The six significant weaknesses and five of the remaining weaknesses assigned by the SSEB were based on the various components of SOW 3.2.6. The SSEB assigned a significant weakness based on what it referred to in its evaluation as "SOW 3.2.6.2," stating in the evaluation that: "The Offeror's proposal lacks details on the Offeror's approach to security technical assessment and insider threat assessment, and lacks relevant details on experience for any past, or current projects." The SSEB assigned a second significant weakness based on what it referred to in its evaluation as "SOW 3.2.6.5," stating in the evaluation that: "The Offeror's proposal lacks significant detail and provides no information on an approach to or experience in providing Computer Network Defense (CDN) Service Provider (SP) & inspection services for on-going or completed projects." The SSEB assigned a third significant weakness based on what it referred to in its evaluation as "SOW 3.2.6.6," stating in the evaluation that: "The Offeror's proposal lacks significant detail and provides no information on an approach to or experience in providing vulnerability assessment, metrics consolidation and reporting activities for on-going or completed projects." The SSEB assigned a fourth significant weakness based on what it referred to in its evaluation as "SOW 3.2.6.8," stating in the evaluation that: "The Offeror's proposal lacks significant detail and provides no information on an approach to or experience in providing Information Assurance tools administration and maintenance for on-going or completed projects." The SSEB assigned a fifth significant weakness based on what it referred to in its evaluation as "SOW 3.2.6.10," stating in the evaluation that: "The Offeror's proposal lacks detailed information within, or does not seem to address PKI procedures and guidance." The SSEB assigned a sixth significant weakness based on what it referred to in its evaluation as "SOW 3.2.6.11," stating in the evaluation that: "The Offeror's proposal lacks details on the Offeror's approach to IA cross domain solutions and support, and lacks relevant details on any experience for a past or current project."

The SSEB assigned the first weakness related to SOW 3.2.6 on what it referred to in its evaluation as "SOW 3.2.6.1," stating in the evaluation that:

The Offeror's proposal describes an approach but lacks detail on experience providing cybersecurity information assurance (IA) policy development, security compliance and certification and accreditation (C&A) activities for on-going or completed projects.

The Offeror's proposal, page 96, cites: ". . . Our IT Security Policy Team will focus on the development, maintenance and improvement of the IT Security

> Policy for DIA that is aligned with DoD Directives, ICD, CJCSI, FISMA and DIA policy . . .".

(omissions in original). The SSEB assigned a second weakness related to SOW 3.2.6 based on what it referred to in its evaluation as "SOW 3.2.6.3," stating in the evaluation that:

> The Offeror's proposal details the Offeror's approach to security architecture development and engineering but lacks relevant details on experience for any past, or current projects.
>
> The Offeror's proposal, page 96, cites: ". . . Our Security Architecture Team will develop, maintain and improve a TRM [Technical Reference Model] that assess [sic] products, technologies and standards for use within the enterprise. The Team will analyze products, technologies and standards that are proposed for use within the Enterprise. The Team then documents the results of the analysis, and provides a recommendation for addition or exclusion to the TRM, and a rational [sic] for the recommendation. . .".
>
> The Offeror's proposal, page 96, cites: ". . . works closely with the Security Architecture Team to develop common deployment standards and methodologies for products and technologies used within the Enterprise. The Team develops, maintains, and improves upon specific product technology and standard implementation guides that illustrate how they are to be configured and used within the Enterprise to ensure security strategy alignment and standardization. . .".

(omissions in original). The SSEB assigned a third weakness related to SOW 3.2.6 based on what it referred to in its evaluation as "SOW 3.2.6.4," stating in the evaluation that:

> The Offeror's proposal lacks description of their depth and breadth of experience and details of their expertise on similar on-going and completed projects as defined in M-3.2.2 Sub-factor 2: Technical Experience and Expertise mapped to functional areas listed in SOW.
>
> The Offeror's proposal, pages 96-97, cites: ". . . The Information Assurance Training Team develops, maintains and improves user IT Security Awareness and role based training for personnel with IT Security related responsibilities. The Team also provides reporting for annual training requirements . . .".

(omissions in original). The SSEB assigned a fourth weakness related to SOW 3.2.6 based on what it referred to in its evaluation as "SOW 3.2.6.7," stating in the evaluation that:

> The Offeror's proposal describes an approach but lacks detail on experience providing Computer Network Defense (CND) operations, monitoring and analysis for on-going or completed projects.

> The Offeror's proposal, page 16, cites: ". . . At USSTRATCOM, USTRANSCOM [United States Transportation Command], AFWA. [sic] MCTSSA [Marine Corps Tactical Systems Support Activity], IRS, NITC [National Information Technology Center], EPA, and VA we provide a wide range of cyber security to include policy, documentation, information assurance and CND. . . ".

(omissions in original). The SSEB assigned a fifth weakness related to SOW 3.2.6 based on what it referred to in its evaluation as "SOW 3.2.6.9," stating in the evaluation that:

> The Offeror's proposal lacks description of their depth and breadth of experience and details of their expertise on similar on-going and completed projects as defined in M-3.2.2 Sub-factor 2: Technical Experience and Expertise mapped to functional areas listed in SOW.

> The Offeror's proposal, page 97, cites: ". . . The SOC [Security Operations Center] conducts security monitoring and analysis services for the enterprise. The SOC monitors the SEIM and Antivirus tools 24/7/356 [sic] and records security events. When events are recorded the SOC conducts preliminary investigations of those events to determine if the event is an actual security issue. When an issue does arise the SOC escalates the incident to the Incident response team for a formal and thorough investigation. When false positives are found the SOC works with the Support Teams and ISO's [International Organization for Standardization] to ensure they are remediated. The SOC will also utilize predictive analysis tools to assist with the investigation and escalation of events security events [sic] in a proactive fashion. The Incident Response (IR) Team conducts formal investigation of security events and incidents that have been escalated by the SOC. The IR Team record, [sic] tracks, contains, remediates and reports all incidents. The IR Team facilitates and coordinates intra and intra [sic] agency teams as necessary until incident closure . . .".

(omissions in original).

On July 10, 2015, DIA informed Constellation West that it was not selected for an award. In its unsuccessful offeror notification later sent to Constellation West on July 17, 2015, DIA stated that Constellation West's proposal was not selected because "it did not represent the best value to the Government based on a thorough review of your proposal against the stated criteria in Section M of the RFP."

On August 14, 2015, Constellation West filed a bid protest complaint in this court in case number 15-876C. In its complaint, Constellation West alleges that DIA's evaluation of its proposal was arbitrary, capricious, and contrary to law because it differed significantly from the process disclosed in the solicitation. In particular, Constellation West alleges that it was assigned weaknesses under M-3.2.1.1e, M-3.2.1.2e, SOW 3.2.4.9, SOW 3.2.4.12, and SOW 3.2.6 based on criteria not stated in the solicitation.

Constellation West alleges that DIA's actions have substantially prejudiced it because had DIA not acted improperly Constellation West would have been awarded an E-SITE contract. Constellation West's requests include that the court enjoin DIA from proceeding with performance under the E-SITE contract and that the court order DIA to re-evaluate its proposal in accordance with the stated criteria in the solicitation.

## Sev1Tech

Like Constellation West, protestor Sev1Tech timely submitted the first set of volumes of its proposal on April 18, 2014, and the second set of volumes on May 16, 2014. DIA assigned Sev1Tech's proposal a Substantial Confidence (blue) rating for the Past Performance Factor, a Good (purple) for the Management/Technical Factor, and a Pass (green) for the Security/Supply Chain Risk Management Factor. With regard to price, however, DIA concluded that because the pricing spreadsheet Sev1Tech submitted with its proposal was incomplete, omitting labor rates for [redacted] of the 2,890 cells contained in the spreadsheet, and because DIA "was not able to calculate projected rates for these labor categories from the face of the proposal," Sev1Tech's total evaluated price could not be determined.

The [redacted] labor rates Sev1Tech omitted from the proposal were for option year four in skill levels 1, 2, and 3 of the Systems Architect labor category in the United States Group 5 location. In a portion of the pricing volume of its proposal titled "Escalation," Sev1Tech, however, indicated the following:

> The BLS Employment Cost Index Table 5. COMPENSATION (NOT SEASONALLY ADJUSTED): Employment Cost Index for total compensation, for private industry workers, by occupational group and industry for the 12 months ending March 2014 reflects [redacted]% for the Professional and Related Occupational group. All expectations and predictions show the economy improving over the next several years. By year five of the contract, the economy should be supporting annual employment cost index numbers of [redacted]%. These numbers allow us to maintain annual salary increases for our existing staff, while keeping the labor escalation at [redacted]% per year over contract life.

(capitalization in original).

An April 27, 2015 MFR titled "Contracting Officer's Record of Decisions to Clarify Incomplete Price Volumes for the Enhanced Solutions for the Information Technology Enterprise (E-SITE) solicitation" prepared by the contracting officer, noted that eight price proposals, including Sev1Tech's, were missing labor ceiling rates.[3] For the other seven offerors, the MFR stated:

---

[3] This April 27, 2015 MFR is distinct from the two other April 27, 2015 MFRs discussed above, titled "Management/Technical Evaluation Process" and "Past Performance Evaluations and Management/Technical Evaluation Rating Differences."

the Government could ascertain the Offerors' intended prices by calculating the intended escalation rates to the hundredth of the percentage. The Government did take into account rounding errors in the calculations. The intended prices were apparent from the face of the proposal. Clarifications were conducted with these Offerors.

The MFR went on to state:

3. The Government was unable to ascertain the intended unit ceiling prices for the Offeror Sev1Tech.

4. The Government attempted to estimate the missing unit ceiling prices for the Offeror Sev1Tech using three different estimation methods. All three methods were unsuccessful.

a. The price proposal summary was researched, and the Offeror stated that and [sic] escalation of [redacted]% was chosen. When the Government attempted to verify this for the Systems Architect labor category, escalation rates varied from [redacted]% to [redacted]%.

b. Next, five random overseas labor categories and five CONUS [Continental United States] labor categories were selected for analysis from Sev1Tech's Price spreadsheet. It was found, with consideration for minor rounding errors being acceptable, that the majority of the labor categories randomly sampled yielded an approximate [redacted]% escalation as proposed. However, there were numerous anomalies found within multiple labor categories and at least one group/location within each of those labor categories that deviated from the proposed [redacted]% escalation. There was no discernable pattern among the randomly sampled labor rates for the Government to determine exactly what the escalation for all incomplete rates was intended to be.

c. Lastly, escalation rates for all Group 5 labor category ceiling rates were estimated to determine if there was a discernable pattern among those rates. It was again found that the majority of rates in the Group 5 location adhered to the proposed [redacted]% escalation but there were nine (9) instances of anomalies within the Group 5 escalation rates found. The escalation rates determined to be anomalies ranged from [redacted]% to [redacted]%. There was no discernable pattern among the Group 5 escalation rates for the Government to determine exactly what the escalation for all the incomplete rates was intended to be.

5. Based on the inconsistencies in escalation rates among all three methods, the Government determined that Sev1Tech's intended price could not be ascertained from the face of the proposal. The Contracting Officer

determined this to be a material deficiency and did not conduct clarifications with Sev1Tech.

DIA's attempts discussed in the April 27, 2015 MFR to determine what Sev1Tech intended to propose for the missing labor rates were documented in an earlier MFR, dated April 23, 2015 also prepared by the contracting officer, titled "Contracting Officer's Record of Incomplete Price Volume for the Enhanced Solutions for the Information Technology Enterprise (E-SITE) solicitation, RFP number HHM402-14-R-0002, for Offeror Sev1Tech." The April 23, 2015 MFR begins by noting the [redacted] missing labor rates in Sev1Tech's pricing spreadsheet. The MFR also notes Sev1Tech's statement in the price volume of its proposal that it would keep "labor escalation at [redacted]% per year over contract life." The MFR then states that DIA first attempted to estimate Sev1Tech's [redacted] missing labor rates using the following table, reproduced as it appeared in the MFR:

| Labor Category | Level | Period of Performance | Rate | Escalation Rate | Average Escalation Rate per Level |
|---|---|---|---|---|---|
| Systems Architect | Level 1 | Base Year | | | |
| Systems Architect | Level 1 | Option Year 1 | | | |
| Systems Architect | Level 1 | Option Year 2 | | | |
| Systems Architect | Level 1 | Option Year 3 | | | |
| Systems Architect | Level 1 | Option Year 4 | | | |
| Systems Architect | Level 2 | Base Year | | | |
| Systems Architect | Level 2 | Option Year 1 | | | |
| Systems Architect | Level 2 | Option Year 2 | [Redacted] | | |
| Systems Architect | Level 2 | Option Year 3 | | | |
| Systems Architect | Level 2 | Option Year 4 | | | |
| Systems Architect | Level 3 | Base Year | | | |
| Systems Architect | Level 3 | Option Year 1 | | | |
| Systems Architect | Level 3 | Option Year 2 | | | |
| Systems Architect | Level 3 | Option Year 3 | | | |
| Systems Architect | Level 3 | Option Year 4 | | | |

The MFR further states that DIA next randomly selected five labor categories from overseas locations and five from United States locations from Sev1Tech's pricing spreadsheet to perform a similar analysis. According to the April 23, 2015 MFR:

It was found, with consideration for minor rounding errors being acceptable, that the majority of the labor categories randomly sampled yielded an approximate [redacted]% escalation as proposed. However, there were numerous anomalies found within multiple labor categories and at least one

> group/location within each of those labor categories that greatly deviated from the proposed [redacted]% escalation. There was no discernable pattern among the randomly sampled labor rates for the Government to determine exactly what the escalation for the incomplete rates should be[.]

For example, an attachment to the MFR shows that for the Cybersecurity Officer labor category in the United States Group 4 location, five of the fifteen possible escalation rates deviated greatly from [redacted]%, with a low of [redacted]% and a high of [redacted]%. DIA then examined escalation rates for all labor categories in the United States Group 5 location.  According to the MFR,

> It was again found that the majority of rates in the Group 5 location adhered to the proposed [redacted]% escalation but there were nine (9) instances of anomalies within the Group 5 escalation rates found. The escalation rates determined to be anomalies ranged from [redacted]% to [redacted]%. There was no discernable pattern among the Group 5 escalation rates for the Government to determine exactly what the escalation for the incomplete rates was intended to be.

"Based on the inconsistencies in escalation rates among all three methods," DIA concluded that Sev1Tech's intended labor rates for the missing cells could not be estimated "from the face of the proposal." The MFR further stated: "It is also the Government's opinion that this is a material deficiency and is not a minor or clerical error that can be resolved during clarification since the intended offer is not apparent on the face of the proposal." The MFR concluded by stating that because the missing rates were a material failure "the Contracting Officer has determined that the Sev1Tech Price Proposal as [sic] incomplete and is hereby excluded from further competition for an E-SITE IDIQ award."

On July 10, 2015, DIA informed Sev1Tech that it had not been selected for an award. In a July 17, 2015 letter to Sev1Tech, DIA stated that Sev1Tech's proposal was not eligible for an award based on the following deficiency:

> Upon evaluation of the Sev1Tech submitted Price proposal, Volume V [Price], it was discovered that a total of [redacted] individual labor category rates were not proposed. Cells (US Price Groups tab) H642:H644 were displayed as blank. Pursuant to the solicitation, offerors were required to propose binding ceiling rates for these cells. The Government attempted to discern the Offeror's intended price but was ultimately unable to determine the Offeror's intended price from the face of the proposal. The price proposal was assigned a deficiency as the failure to propose binding ceiling prices for the subject labor categories constitutes a material failure to meet a Government requirement.

As noted in the April 27, 2015 MFR, seven offerors in addition to Sev1Tech submitted proposals with incomplete pricing spreadsheets: AiNET Corporation (AiNET), DKW Communications, Inc. (DKW), Jupiter Systems Alliance (Jupiter), Progressive

Technologies (Progressive), Responsive Innovative Information Technology Enterprise (RiiTE), Sotera Defense Solutions, Inc. (Sotera), and Syneren Technologies Corporation (Syneren). As in the case of Sev1Tech, the contracting officer prepared MFRs for each of the seven other offerors documenting DIA's attempts to determine the missing labor rates. In each of the MFRs, DIA applied the same three methods as were applied to Sev1Tech's proposal to try to establish if the offerors' intended rates could be determined "from the face of the proposal." First, DIA examined the escalation rates for the non-missing items in the specific labor category and geographic group in which the missing cells were found. Next, it looked at the escalation rates for a random sample of five United States and five international labor categories. Finally it looked at escalation rates for all labor categories in the same geographic location as the missing cells. If the price portion of the offeror's proposal mentioned an escalation rate, DIA also looked to see if the escalation rates in each of these methods matched the stated rate. If the offeror's intended prices for the missing cells could be determined through DIA's analysis, DIA proceeded to email the offeror asking for clarification. The clarification consisted of only two questions:

> **Clarification 1.** The Government found [ ] individual labor category rate[s] [was/were] not proposed.[4] [Describes missing rates]
>
> > **Question:** Did you intend to provide pricing for [this/these] cell[s]? YES or NO
>
> > (**Note:** If the response is NO, then a response is not required to be provided for Clarification 2.)
>
> **Clarification 2.** Based on the information provided in your proposal, the Government believes you intended to propose [an] escalation rate[s] of [redacted]%.[5] Using [this/these] escalation rate[s], it is apparent to the Government that you intended to propose the rates identified below.
>
> > **Question:** Is the pricing that you intended to propose correctly listed in the table below? YES or NO

(emphasis and capitalization in original). The clarification questions allowed only for a yes or no answer. These questions were followed by a table showing the relevant labor categories with the missing rates filled in using the DIA's proposed escalation rates.

---

[4] This sentence in Clarification 1 was phrased slightly differently in the clarification request sent to AiNET, which stated: "The Government found [redacted] cells G59:G62 in the overseas tab of the price spreadsheet to be blank."

[5] This sentence in Clarification 2 was phrased slightly differently in the clarification request sent to AiNET, which stated: "Based on the information provided in your proposal, the Government believes you intended to propose an escalation rate of [redacted]% for the Seoul Korea location."

For the seven proposals with missing pricing cells, other than Sev1Tech, DIA ultimately determined that it could ascertain the offerors' intended labor rates by calculating the intended escalation rates to the hundredth of the percentage, and that the intended labor rates, thus, were apparent from the faces of the proposals. Therefore, unlike for Sev1Tech, DIA requested clarifications from the other seven offerors. All seven replied yes to both of the clarification questions. Two of the seven offerors, DKW and RiiTE, were ultimately awarded an E-SITE contract.

The spreadsheet submitted with AiNET's proposal included [redacted] blank cells for the Installation Specialist labor category in the Seoul, South Korea location. In the MFR prepared for AiNET's proposal, DIA first noted that AiNET's price proposal made no mention of a proposed escalation rate. DIA then found that the escalation rates for all of the non-missing cells in the Installation Specialist category in Seoul were [redacted]%. Examining five random United States and five random overseas categories, DIA found that the "large majority" of the overseas rates had escalation rates of [redacted]%, but that there were some rates in "particular labor categories and locations that did not adhere to the [redacted]% escalation." Finally, DIA found that all escalation rates for all non-missing cells for labor categories in Seoul were [redacted]%. Based on these findings, DIA requested a clarification from AiNET as to whether they intended to utilize a [redacted]% escalation rate in their missing cells.

The spreadsheet submitted with DKW's proposal included [redacted] blank cells, [redacted] for the Systems Engineer labor category in the United States Group 4 location, [redacted] for the Systems Architect labor category in the United States Group 5 location, and [redacted] for the Service Desk Specialist labor category in the Germany location. In the MFR prepared for DKW's proposal, DIA first noted that DKW's price proposal stated that it used an escalation rate of [redacted]%. DIA then found that the escalation rates for all of the non-missing cells in the Systems Engineer and Systems Architect categories in the United States Groups 4 and 5 locations were [redacted]% and that those for the Service Desk Specialist category in Germany ranged from [redacted]% to [redacted]% with an average escalation rate of [redacted]%. Examining five random United States and five random overseas locations, DIA found a [redacted]% escalation rate was used for each location. Finally, DIA found that the escalation rates for all non-missing cells in the United States Group 4, United States Group 5, and Germany locations were [redacted]%. Based on these findings, DIA requested a clarification from DKW as to whether they intended to utilize a [redacted]% escalation rate in their missing cells.

The spreadsheet submitted with Jupiter's proposal included [redacted] blank cells for the Satellite Field Service Technician labor category in the United States Group 2 location. In the MFR prepared for Jupiter's proposal, DIA first found that the language in Jupiter's price proposal was "too vague to determine if the Offeror intended to complete all unit pricing." DIA then found that the only non-missing cells for the Satellite Field Service Technician labor category in the United States Group 2 location were for the base year and option year one and that for each of these cells the escalation rate was [redacted]%. Examining five random United States and five random overseas labor categories, DIA found that every category yielded the same escalation rate pattern of [redacted]% escalation for option years one through three with a [redacted]% escalation

for option year four.  Finally, DIA found that all escalation rates in for non-missing cells in the United States Group 2 location followed this same pattern of a [redacted]% escalation for option years one through three with a [redacted]% escalation for option year four. Based on these findings, DIA requested a clarification from Jupiter as to whether they intended to utilize an escalation rate pattern of [redacted]% escalation for option years one through three and [redacted]% escalation for option year four in their missing cells.

The spreadsheet submitted with Progressive's proposal included [redacted] blank [redacted] for the base year of the Cybersecurity labor category in the Germany location. In the MFR prepared for Progressive's proposal, DIA first noted that Progressive's price proposal stated that its price escalation rate would be [redacted]% for all years. DIA then found that the escalation rates in the Cybersecurity labor category in the Germany location were between [redacted]% and [redacted]% for option years one and two, between [redacted]% and [redacted]% for option year three and between [redacted]% and [redacted]% for option year four. Examining five random United States and five random overseas categories, DIA found that "the yearly escalation was not actually [redacted]%, but varied between the different option years, labor categories, and locations." Finally, DIA found that all escalation rates for all non-missing cells in all German labor categories followed a [redacted]%, [redacted]%, [redacted]%, [redacted]% escalation pattern. Based on these findings, DIA requested a clarification from Progressive as to whether they intended to utilize a [redacted]% escalation rate in their missing cell.

The spreadsheet submitted with RiiTE's proposal failed to include rates for [redacted] cells for option year two of the Database Administrator labor category in the United States Group 5 location. In the MFR prepared for RiiTE's proposal, DIA first noted that RiiTE's price proposal stated that price escalation would be [redacted]% for option year one, [redacted]% for option year two, [redacted]% for option year three and [redacted]% for option year four. DIA then found that the escalation rates that could be determined for the non-missing cells in the Database Administrator category for the United States Group 5 location were [redacted]% for option year one and [redacted]% for option year four. Examining five random United States and five random overseas categories, DIA found that the yearly escalation rates were [redacted]% for option year one, [redacted]% for option year two, [redacted]% for option year three and [redacted]% for option year four. Finally, DIA found the escalation rates for all non-missing cells in the United States Group 5 location were [redacted]% for option year one, [redacted]% for option year two, [redacted]% for option year three and [redacted]% for option year four. Based on these findings, DIA requested a clarification from RiiTE as to whether they intended to utilize an escalation rate of [redacted]% for the missing option year two cells.

The spreadsheet submitted with Sotera's proposal included [redacted] blank cells for the Program Manager labor category in the Germany location. In the MFR prepared for AiNET's proposal, DIA first noted that Sotera's price proposal proposed an escalation rate of [redacted]%. DIA then found that the escalation rates for all of the non-missing cells were [redacted]% in level one, [redacted]% in level two, and [redacted]% in level three and four. Examining five random United States and five random overseas categories, DIA found that "the yearly escalation was not actually [redacted]%, but varied

between the different option years, labor categories, and locations." Finally, DIA found that all escalation rates for all non-missing cells in Germany categories followed the escalation pattern of [redacted]% in level one, [redacted]% in level two, and [redacted]% in level three and four. Based on these findings, DIA requested a clarification from AiNET as to whether they intended to utilize and escalation pattern of [redacted]% in level one, [redacted]% in level two, and [redacted]% in level three and four in their missing cells.

The spreadsheet submitted with Syneren's proposal failed to include rates for [redacted] cells, [redacted] for the System Administrator labor category in the United States Group 4 location and [redacted] for the option year four of the Network Engineer labor category in the United Kingdom location. In the MFR prepared for Syneren's proposal, DIA first noted that the language in the price volume of Syneren's proposal was "too vague to determine if the Offeror intended to complete all unit pricing." DIA then found that the escalation rates for all of the non-missing cells in the System Administrator category in the United States Group 4 location were [redacted]% and that, for the Network Engineer category in the United Kingdom, all escalation rates were [redacted]% for option year one, [redacted]% for option year two, [redacted]% for option year three, and undeterminable for option year four because all labor rates for year four were missing. Examining five random United States and five random overseas categories, DIA found that yearly escalation rate was [redacted]% for all United States pricing group locations and that the majority of overseas pricing groups followed a pattern of [redacted]% escalation for option year one, [redacted]% for option year two, [redacted]% for option year three, and [redacted]% for option year four, but that there were also "a number of rates within multiple Overseas Labor Categories that did not follow this pattern and appeared to be random in nature." Finally, DIA found that all escalation rates for all non-missing cells in the United States Group 4 location were [redacted]% and that price escalation for the United Kingdom location followed the [redacted]%, [redacted]%, [redacted]%, [redacted]% escalation pattern "with exception for the System Administrator labor category which followed a straight [redacted]% escalation rate between all levels and option years." DIA noted that the missing rates in the United Kingdom location all involved option year four and that "[w]hile there is an apparent lack of consistency within the United Kingdom labor rates, all Option Year 4 rates with the United Kingdom labor rates is [sic] slated to have a [redacted]% escalation from the Option Year 3 rate regardless of being a part of the [redacted]%, [redacted]%, [redacted]%, [redacted]% pattern or the [redacted]%, [redacted]%, [redacted]%, [redacted]% pattern." DIA thus concluded that Syneren's intended rates for option year four of the Network Systems Administrator category in the United Kingdom location could be determined "from the face of the proposal due to the found [redacted]% escalation rate for all Option Year 4 labor categories with the United Kingdom location." Based on these findings, DIA requested a clarification from Syneren as to whether they intended to utilize an escalation rate of [redacted]% for both the missing United States and United Kingdom location rates.

Sev1Tech, unlike Constellation West, first filed a protest on July 22, 2015 with the Government Accountability Office (GAO) contesting DIA's awards under the E-SITE solicitation. On August 18, 2015, the GAO dismissed Sev1Tech's protest on the grounds that a protest of the E-SITE solicitation had subsequently been filed in the United States

Court of Federal Claims by another disappointed offeror.[6] On August 24, 2015, Sev1Tech filed its complaint in this court in case number 15-923C. In its complaint, Sev1Tech alleges that DIA's actions were arbitrary, capricious, and in violation of law on three grounds. First, Sev1Tech alleges that the proposed labor rates for the missing cells in its proposal were obvious on the face of the proposal because Sev1Tech stated in its Price Volume that it was "keeping the labor escalation at [redacted]% per year over contract life." Sev1Tech alleges that DIA's failure to consider information it alleges was obvious on the face of Sev1Tech's proposal was arbitrary and capricious and violated the Competition in Contracting Act (CICA), the Federal Acquisition Regulations (FAR), and the evaluation criteria stated in the solicitation. Second, Sev1Tech alleges that the [redacted] missing cells in its price proposal constituted only a "minor irregularity" and that DIA's decision not to exercise its discretion under section L.3 of the solicitation and FAR 52.215-1(f)(3) (2015) to "waive informalities and minor irregularities in proposals received" was arbitrary and capricious. Third, Sev1Tech alleges that its omission of the [redacted] price cells constituted a "minor or clerical error" and that DIA's failure to exercise its discretion under FAR 15.306(a)(2) (2015) to seek clarifications from Sev1Tech was an abuse of discretion, arbitrary and capricious, and contrary to the requirements of the CICA, the FAR, and the solicitation. Sev1Tech alleges it was prejudiced by each one of these alleged failures by DIA. Sev1Tech's requests include that the court order DIA to re-evaluate Sev1Tech's pricing spreadsheet taking into account the statement in Sev1Tech's proposal that Sev1Tech was "keeping the labor escalation at [redacted]% per year over contract life" as well as "other evidence of what Sev1Tech intended to put in the missing cells." Sev1Tech also asks this court to direct DIA to conduct a new best-value analysis taking into account its re-evaluation of Sev1Tech's pricing proposal. Finally, Sev1Tech requests an injunction prohibiting DIA from awarding any work under the E-SITE contract until DIA has taken these actions.

Relevant to both cases, numbers 15-876C and 15-923C, the government filed an administrative record, followed by a corrected administrative record, and then followed by a revised administrative record. The parties in both cases filed a single joint brief stipulation of facts. The two protestors filed separate motions for judgment on the administrative record in their respective cases. For both cases, defendant filed a single cross-motion for judgment on the administrative record and responses to protestors' motions. Protestors filed separate responses to defendant's motion, to which defendant filed a single reply. A single oral argument was held in the two protests. At oral argument, the court requested a supplement to the revised administrative record and additional briefing in case number 15-923C related to DIA's decision to request clarifications from the seven offerors other than Sev1Tech with incomplete pricing spreadsheets, and both Sev1Tech and the government subsequently submitted brief, supplemental filings.

---

[6] The GAO's decision dismissing the Sev1Tech's protest states that the disappointed offeror was Knowledge Systems, LLC. Knowledge Systems, LLC filed a complaint in this court protesting the E-SITE solicitation on August 4, 2015 in case number 15-832C. The Knowledge Systems, LLC complaint, however, was one of the protests dismissed earlier, on September 9, 2015, after both of the protests in the above captioned cases had been filed in this court.

**DISCUSSION**

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (2015) (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. and Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Kingdomware Techs., Inc. v. United States, 754 F.3d 923, 930 (Fed. Cir.) ("In reviewing an agency's action in a bid protest case, we generally apply the Administrative Procedure Act's 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'without observance of a procedure required by law' standard of review." (citing 5 U.S.C. § 706(2)(A), (D) (2012), reh'g en banc denied (Fed. Cir. 2014), cert. granted, 83 U.S.L.W. 3654 (U.S. June 22, 2015)); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003). The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services*, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States,

691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); <u>see</u> <u>also</u> <u>Rockies Exp. Pipeline LLC v. Salazar</u>, 730 F.3d 1330, 1336 (Fed. Cir. 2013), <u>reh'g denied</u> (Fed. Cir. 2014); <u>Distrib. Solutions, Inc. v. United States</u>, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), <u>reh'g denied</u> (Fed. Cir. 2008); <u>RAMCOR Servs. Grp., Inc. v. United States</u>, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). <u>See</u> <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir. 2013) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350–51 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057–58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)), <u>aff'd</u>, 365 F.3d 1345 (Fed. Cir. 2004))), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[7] <u>see also</u> <u>Tinton Falls Lodging Realty, LLC v.</u>

---

[7] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's

_____

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990). Moreover,

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts.  See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)).  """If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753,

755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Const. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. 226, 231 (2012) ("'Federal procurement entities have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation."'" (quoting K-Lak Corp. v. United States, 98 Fed. Cl. 1, 8 (2011) (quoting Tyler Const. Grp. v. United States, 570 F.3d at 1334))), aff'd, 754 F.3d 923 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014), cert. granted, 83 U.S.L.W. 3654 (U.S. June 22, 2015); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (Fed. Cir. 2002). Furthermore, according to the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis

review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))); Cohen Fin. Servs., Inc. v. United States, 112 Fed. Cl. 153, 162 (2013); McVey Co., Inc. v. United States, 111 Fed. Cl. at 402.

Moreover, in a negotiated procurement, contracting officers generally may be afforded greater decision making discretion, in comparison to their role in sealed bid procurements. See Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("The protestor's burden is greater in negotiated procurement, as here, than in other types of bid protests because '"the contracting officer is entrusted with a relatively high degree of discretion."'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (quoting Burroughs Corp. v. United States, 223 Ct. Cl. 597–98, 617 F.2d 590, 597 (1980)))); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." (internal citations omitted)); Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002) ("Moreover, in a negotiated procurement, as in this case, this court has held that the regulations entrust the contracting officer with especially great discretion, extending even to his application of procurement regulations."), reh'g en banc denied (Fed. Cir.), cert. denied, 540 U.S. 937 (2003). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct. WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (internal citations omitted))).

The United States Court of Appeals for the Federal Circuit also has explained that procurement officials have a greater degree of discretion when it comes to best-value determinations, as compared to a procurement based on price alone. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also Croman Corp. v. United States, 724 F.3d at 1363 (noting the significant discretion contracting officers possess when awarding contracts on the basis of best value to the agency (citing Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355)); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (1996)); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355

("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327–28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); AM Gen., LLC v. United States, 115 Fed. Cl. 653, 697 (2014); Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

In E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in best value determinations:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason . . . even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

> ***

> Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings . . . which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.").

E.W. Bliss Co. v. United States, 77 F.3d at 449; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 908 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); COMINT Sys. Corp. v. United States, 700 F.3d at 1384 (quoting same); Tyler Const. Grp. v. United States, 570 F.3d at 1334 (citing same); CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting same); Galen Med. Assoc., Inc. v. United States, 369 F.3d at 1330 (quoting same); R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing same); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 780; Galen Med. Assocs., Inc. v. United States, 74 Fed. Cl. 377, 383–84 (2006); JWK Int'l Corp. v. United States, 49 Fed. Cl. at 388.

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

When the contracting officer's discretion grows, so does the burden on the protestor to overturn the contracting officer's decisions. As described in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (internal citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327–28; E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles &

Space Co. v. Bentsen, 4 F.3d at 958–59); see also Croman Corp. v. United States, 724 F.3d at 1363; Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Bahrain Maritime & Mercantile Int'l BSC v. United States, 118 Fed. Cl. 462 (2014); Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 125 (2010) (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("An agency's contract award is thus least vulnerable to challenge when based upon a best value determination.")); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

## Constellation West

In case number 15-876C, protestor Constellation West alleges that DIA acted arbitrarily, capriciously, and contrary to law when it assigned the six significant weaknesses and nine of the twenty six total weaknesses to the Management/Technical portion of Constellation West's proposal, based on criteria Constellation West asserts were not stated in the solicitation. In particular, Constellation West alleges that it was wrongfully assigned two weaknesses based on Sections M-3.2.1.1.e and M-3.2.1.2e of the solicitation, two weaknesses based on SOW 3.2.4.9 and SOW 3.2.4.12, and six significant weaknesses and five weaknesses based on SOW 3.2.6. Constellation West further argues that it was prejudiced by DIA's actions because it alleges it would have had a substantial chance of receiving a contract award had DIA's alleged errors not occurred. In response, defendant denies that DIA relied on unstated criteria when evaluating Constellation West's proposal. Defendant further argues that Constellation West has not shown, and cannot show, that it was prejudiced by any of the alleged errors.

This court in Banknote Corp. of America, Inc. v. United States summarized this area of the law:

> It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is firmly rooted in the Competition in Contracting Act (CICA) . . . which indicate[s] that an agency shall evaluate competitive proposals and assess their qualities solely on the factors and subfactors specified in the solicitation. See 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000) . . . . It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals, Acra, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999), and, where appropriate, must disclose the factors' relative importance, Isratex, Inc. v. United States, 25 Cl. Ct. 223, 230 (1992). See also Cube Corp. v. United States, 46 Fed. Cl. 368, 377 (2000); Dubinsky v. United States, 43 Fed. Cl. 243, 266 (1999). That said, an agency still has "great discretion in determining the scope of an evaluation

factor." *Forestry Surveys and Data v. United States,* 44 Fed. Cl. 493, 499 (1999). Consistent with these precepts, in a case such as this, a protester must show that: (i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error.

\*\*\*

[I]t is well-settled that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 45 (1997)[.]

Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386-87 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) (footnote and other citations omitted); see also NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015); FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 388 ("It is a fundamental principle of procurement law that an agency must conduct its best-value analysis using the evaluation factors and subfactors specified in the solicitation." (citing 48 C.F.R. § 15.101–1(b)(1); 48 C.F.R. § 15.305(a); Acra, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999))); PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 536-37; NEQ, LLC v. United States, 88 Fed. Cl. 38, 47-48 (2009); PHT Supply Corp. v. United States, 71 Fed. Cl. at 13-14.

*M-3.2.1.1e*

    Constellation West argues that DIA relied on unstated criteria when it evaluated the Management/Technical portion of Constellation West's proposal as having a weakness under Section M-3.2.1.1e, on the grounds that the proposal "lacks description of capacity planning that includes monitoring trends of capacity usage and projecting capacity requirements to stay ahead of demand." The relevant portions of Section M-3.2.1.1 states:

    The offeror shall provide evidence of their in-depth understanding and ability to support current/projected IC wide transition and integration efforts (e.g. Intelligence Community Information Technology Enterprise (IC ITE), Joint Information Environment (JIE). . . ) and their ability to apply new and emerging technologies/capabilities in the following demonstration areas.

\*\*\*

    e. Capacity planning approaches.

Constellation West argues that Section M-3.2.1.1e does not contain a requirement to monitor trends or project capacity. Defendant argues that DIA's rationale stated in its evaluation that the capacity planning approach includes monitoring trends of capacity usage and projecting capacity requirements is a technical determination that should not be second guessed by the court. Defendant also argues that DIA's interpretation was

correct because monitoring trends of usage and projecting capacity requirements is intrinsic to the stated criteria of providing capacity planning. Constellation West rejects defendant's explanation as a "*post hoc* excuse invented for convenience."

"[I]t is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'" Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. at 386–87 (quoting Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. at 45) (alteration in original). "[M]onitoring trends of capacity usage and projecting capacity requirements to stay ahead of demand" is intrinsic to the concept of "capacity planning." Indeed, it is difficult to understand how one could plan for future capacity without projecting the demand for that capacity. Therefore, DIA did not apply criteria unstated in the solicitation when it assigned Constellation West a weakness under RFP 3.2.1.1e for failing to explain how it intended to conduct such monitoring and capacity projection.

*M-3.2.1.2e*

Constellation West next argues that DIA erred when it assessed the Management/Technical portion of its proposal a weakness under Section M-3.2.1.2e of the solicitation based on its "distinct lack of information regarding the understanding of needs forecasting of industry and customer's future needs, and how to transition the customer to a better state." Section M-3.2.1.2e required offerors to provide evidence of their experience "[p]rovisioning services using a managed service delivery model, quantitative and qualitative key performance indicators, established service levels, quality assurance reviews, and performance management corrections." Constellation West argues, and defendant concedes, that there is no reference to "forecasting," "future needs," or "transition" in Section M-3.2.1.2e.  Instead, both parties agree that this language was taken from Section M-3.2.1.2a of the solicitation, which requires evidence of experience "[e]ffecting positive change on a customer's operating model and systems by understanding their needs, forecasting industry and the customer's future, and then transitioning them into a better state." Constellation West notes, and review of the record confirms, that its proposal was assessed a meets the standard for Section M-3.2.1.2a.

Defendant asserts that DIA made a scrivener's error by accidentally cutting and pasting the language of Section M-3.2.1.2a into its evaluation of Section M-3.2.1.2e. Defendant cites Office Depot, Inc. v. United States, 95 Fed. Cl. 517 (2010), for the proposition that such scrivener's errors in evaluation reports constitute mere de minimis errors, which are not sufficient grounds for overturning awards decisions. In a footnote, defendant also argues that reliance upon unstated evaluation criteria is not the appropriate analytical framework under which to review this alleged error because the criteria upon which Constellation West was evaluated was stated, albeit in a different section of the solicitation. Constellation West rejects defendant's argument, asserting instead that DIA's evaluation was still based on unstated criteria that was, "in the context of the other errors," more than de minimis.

It is uncontested that DIA erred when it included the language for Section M-3.2.1.1a in its evaluation of Constellation West's proposal under Section M-3.2.1.2e.

Initially, the court agrees with defendant that DIA's apparent cut and paste error did not involve the use of any unstated criteria. Instead, the question is whether DIA's error was merely typographical or whether it affected the score Constellation West received under Section M-3.2.1.2e. See Office Depot, Inc. v. United States, 95 Fed. Cl. at 535 ("Because the parties and the court agree that this noted weakness is erroneous, the only question is whether this 'weakness' is a mere typographical error which had no effect on the score given Office Depot for Key Personnel [factor], or, as plaintiff argues, this erroneous weakness contributed to an incorrect Key Personnel score for Office Depot."). Examination of the administrative record before this court demonstrates that three of the four individual evaluators rated Constellation West's proposal as meets the standard with regard to Section M-3.2.1.2e based on the criteria actually stated in M-3.2.1.e, with each finding that Constellation West's proposal described experience "provisioning services using a managed service delivery model," and two of the three finding that the proposal described experience using "quantitative and qualitative key performance indicators, established service levels, quality assurance reviews, and performance management corrections."[8] The only individual evaluator to assess a weakness under Section M-3.2.1.2e did so by applying the standard from Section M-3.2.1.1a, finding "a distinct lack of information regarding the understanding of needs forecasting of industry and customer's future needs, and how to transition the customer to a better state." Assignments of strengths and weaknesses were to be made based on the consensus of the individual evaluators' reports. Because the only individual examiner to award Constellation West's proposal a weakness under Section M-3.2.1.2e did so based erroneously on the standard set forth in Section M-3.2.1.1a, rather than the one set forth in Section M-3.2.1.2e, the only way DIA's consensus evaluation could have reached the same conclusion was through application of the same erroneous standard. DIA's decision to assign Constellation West a weakness under Section M-3.2.1.2e was, therefore, an error. The nature of the typographical error in the present case thus differs from the one the court found to be de minimis in the case cited by defendant, Office Depot, Inc. v. United States, 95 Fed. Cl. 517. In Office Depot, the court found that a typographical error present in the evaluation panel's report was not reflected in the rating plaintiff ultimately received for the factor because the rating was consistent with the strengths and weaknesses noted by the individual evaluators. See id. at 535. By contrast, the typographical error at issue here was reflected in the weakness score Constellation West received under Section M-3.2.1.2e, which, otherwise, was inconsistent with the comments of the individual evaluators applying the correct standard. The impact of this error is addressed below, in the section of the opinion which addresses prejudice regarding Constellation West.

*SOW 3.2.4.9 and 3.2.4.12*

Constellation West argues that its proposal was wrongfully evaluated using unstated criteria under SOW 3.2.4.9, and SOW 3.2.4.12. Both are part of SOW 3.2.4, which is titled "ENTERPRISE COMPUTING, STORAGE, SHARED AND FIELD SERVICES." (capitalization in original). SOW 3.2.4.9 states that: "The Contractor shall

---

[8] One of the two reviewers referred to the last item as "performance management metrics," rather than "performance management corrections."

provide services to establish Enterprise operations, event monitoring and management, performance monitoring, and analysis services," and SOW 3.2.4.12 states that: "The Contractor shall provide support for planning, execution and management of Enterprise data backup, disaster recovery (DR), and continuity of operations (COOP) operations and support." With regard to SOW 3.2.4.9, DIA's evaluation found that Constellation West's proposal "describes experience performing operations, monitoring, and analysis of something less than enterprise level support." With regard to SOW 3.2.4.12, DIA's evaluation found that Constellation West's proposal "describes experience implementing data backup, disaster recovery (DR), and continuity of operations plan (COOP) at less than an enterprise in accordance with SOW 3.2.4.12." Constellation West argues that nowhere in the solicitation does the government provide a metric, standard, or measure to determine what constitutes enterprise level. Constellation West further argues that it did show evidence of experience working at enterprise level, with the Internal Revenue Service (IRS) for SOW 3.2.4.9 and with the United States Strategic Command, the Air Force Weather Agency, the United States Department of Agriculture, and the Environmental Protection Agency for SOW 3.2.4.12. Constellation West further argues, without citation, that experience serving such allegedly "large, diverse, and complex organizations" meets the "generally accepted meaning of 'enterprise-level support.[']"[9]

Defendant responds that SOW 2.0, titled "SCOPE," (capitalization in original), did provide a metric for determining enterprise level, stating that "the E-SITE contract will provide worldwide coverage" and involve "classified and unclassified programs on multiple networks and security domains." Defendant further argues that DIA's determination that Constellation West's proposal did not evidence enterprise level experience was a discretionary determination that the court should not second guess. Defendant argues that DIA's determination was correct because nothing in Constellation West's proposal showed experience providing support on a worldwide basis which involved both classified and unclassified programs on multiple networks and security domains.

The court notes that the term "enterprise" is not defined in the solicitation. The April 27, 2015 MFR titled "Management/Technical Evaluation Process" stated that, for the purposes of SOW 3.2.4.9 and SOW 3.2.4.12, DIA treated the term as requiring offerors to show "DIA Enterprise equivalent experience." The April 27, 2015 "Evaluation Process" MFR defines the "DIA Enterprise" as being "approximately:"

- 20,000 DIA / 45,000 DoDIIS [Department of Defense Intelligence Information System[10]] / 250,000 IC [Intelligence Community] user base,

---

[9] Constellation West never has identified a specific source for its proposed definition of the word "enterprise." When asked directly by the court at oral argument for evidence to support its claim that it had it had demonstrated enterprise-level experience, Constellation West stated that its experience met the "industry standard," but was unable to point to any source for this standard other than common knowledge.

[10] The Department of Defense Intelligence Information System is "[t]he combination of Department of Defense personnel, procedures, equipment, computer programs, and

- 25 security domains across Unclassified/Secret/Top Secret,
- 5 major world-wide datacenter hubs, and
- 15 regional data centers,
- 550 customer sites[,]
- 900,000 line items of equipment in hardware asset inventory.

Just as the term "enterprise" is not defined in the solicitation, the term "DIA Enterprise" is also not defined in the solicitation. Indeed, the term "DIA Enterprise" is not used in the solicitation. The scope of the E-SITE solicitation described by SOW 2.0, however, covers the same topics as those listed in the April 27, 2015 "Evaluation Process" MFR's definition of "DIA Enterprise." While the "Evaluation Process" MFR states that the "DIA Enterprise" user base included the DIA, Department of Defense Intelligence Information System, and the Intelligence Community, the E-SITE user base described in SOW 2.0a not only encompassed each of these three user groups, but, if anything, was even broader, stating that:

> Participating organizations will use E-SITE task orders to provide IT services to customers across various Departments and Agencies that include, but are not limited to, DIA, CCMDs [Combatant Commands], Air Force, Army, Marine Corps, Navy, Coast Guard, Joint Reserve Intelligence Program, National Command Authorities, other Department of Defense, (DoD) Agencies, multi-national partners (e. g., coalition and alliance), and both DoD and non-DoD members of the Intelligence Community (IC) or other departments or agencies that consume services from the IC members.[11]

Next, the "Evaluation Process" MFR stated that the "DIA Enterprise" included approximately "25 security domains across Unclassified/Secret/Top Secret." Similarly, SOW 2.0b and SOW 2.0f noted that E-SITE involved Unclassified, Classified, and Top Secret work, by stating: "The E-SITE contract will support both classified and unclassified programs on multiple networks and security domains," and "[w]hile the vast majority of the E-SITE contract work is on top secret networks, individual task orders will specifically identify which networks and domains (and their security level) that are to be included in the scope of work," respectively. Moreover, while the "Evaluation Process" MFR stated

---

supporting communications that support the timely and comprehensive preparation and presentation of intelligence and information to military commanders and national-level decision makers." Joint Chiefs of Staff, Joint Publication 1-02, <u>Department of Defense Dictionary of Military and Associated Terms</u>, 65 (Nov. 8, 2010, as amended through Nov. 15, 2015), http://www.dtic.mil/doctrine/new_pubs/jp1_02.pdf (last visited December 15, 2015).

[11] Similarly, SOW 1.0a, "PURPOSE," (capitalization in original) stated that: "The E-SITE contract will establish the acquisition framework for delivering the full scope of information technology services and capabilities to support the DIA, the Combatant Commands (CCMDs), the Military Services intelligence needs, and partner agency worldwide missions across the Intelligence Community (IC)."

that the "DIA Enterprise" involved approximately "5 major world-wide datacenter hubs" and "15 regional data centers," SOW 2.0a made clear that the E-SITE contract involved servicing a very large, global network of IT systems, stating:

> The E-SITE contract will provide worldwide coverage for IT requirements and technical support services supporting the Government through system design, development, fielding, and sustainment of global intelligence and command and control (C2) assets vital to the security of the United States (US).

SOW 2.0 did not list the exact numbers provided in the "Evaluation Process" MFR for each of the portions of the "DIA Enterprise," nor that it would involve "550 customer sites" or "900,000 line items of equipment in hardware asset inventory," but this was reasonable given that they described the global information technology capabilities of the United States intelligence community and the solicitation was an unclassified document posted on the Federal Business Opportunities website. Further, that the E-SITE contract would involve such large numbers of users, networks, and hardware should not have come as a surprise to offerors given the breadth of user organizations described in SOW 2.0. Nor should offerors have been surprised that the scope of the term "enterprise" in SOW 3.2.4.9 and SOW 3.2.4.12 would be coterminous with the scope of the E-SITE contract. That, in the absence of an express definition, the term "enterprise," as used in the SOW, would refer to the E-SITE contract specifically, rather than to the "generally accepted" meaning of the word enterprise, as Constellation West argues, is logical, given that the first sentence of the SOW stated that the SOW "described the basic services contractors must provide to support the Defense Intelligence Agency's (DIA) Enhanced Solutions for the Information Technology Enterprise (E-SITE) contract vehicle."[12] Thus, DIA's evaluation of SOW 3.2.4.9 and SOW 3.2.4.12 did not apply criteria substantially different than that those listed in the solicitation.

While the SSEB's evaluation report does not elaborate as to why it found that Constellation West's proposal had described experience at "something less than enterprise level support" with respect to SOW 3.2.4.9 and "at less than an enterprise in accordance with SOW 3.2.4.12," the April 27, 2015 MFR, titled "Past Performance Evaluations and Management/Technical Evaluation Rating Differences," confirms that the reason was because the proposal "lacked detailed experience on DIA Enterprise scale

---

[12] This interpretation is also bolstered by the use of the term "enterprise" in areas of the SOW other than SOW 3.2.4.9 and SOW 3.2.4.12. In a number of places in the SOW, the term "enterprise," being used as a noun, is preceded by a definite article, e.g., "[t]he Contractor shall provide . . . continuous visibility into the types and numbers of assets throughout the enterprise," (SOW 3.2.1.8), "[a]s required in support of the enterprise, services may also include . . . ," (SOW 3.2.2.6), and "[s]ervices include, but are not limited to . . . acquiring new approved baseline releases from the enterprise," (SOW 3.2.4.1). (all emphasis added). There are no instances in the SOW, however, where the term "enterprise," being used as a noun, is preceded by an indefinite article. This indicates that the term "enterprise" was being used in the SOW to refer to a specific enterprise, rather than the general concept of an enterprise, as Constellation West argues.

projects." With regard to SOW 3.2.4.9, Constellation West stated in its proposal that it had "provided 24/7/365 enterprise support for the IRS," as part of the IRS' "Advanced Server Management Program." With regard to SOW 3.2.4.12, Constellation West stated in its proposal that it had experience providing continuity of operations and disaster recovery support services for the United States Strategic Command, the Air Force Weather Agency, the United States Department of Agriculture, and the Environmental Protection Agency. DIA's evaluation conclusion that Constellation West's experience did not rise to the level of the "DIA Enterprise scale projects" the solicitation called for is a "technical rating[ ] . . . which involve[s] discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d at 449; see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 910-11 (holding that the Navy's determination that "contracts performed by [an offeror] were of similar scope, magnitude, and complexity to that in the Solicitation" as part of the evaluation process "is owed deference"). Further, while Constellation West may be correct that its experience involved support for "large, diverse, and complex organizations," Constellation West points to no evidence in its proposal, and the court's review of the record does not reveal, that its experience encompassed the broad user base, use of classified and unclassified networks, and global reach called for to meet the requirements of either SOW 2.0 or DIA's definition of the "DIA Enterprise." In sum, Constellation West has failed to show that DIA's decision to assess it weaknesses under SOW 3.2.4.9 and SOW 3.2.4.12 for failing to demonstrate experience working at an "enterprise" level was arbitrary, capricious, or contrary to law.

*SOW 3.2.6*

With respect to SOW 3.2.6, Constellation West argues that DIA used unstated criteria when it assigned Constellation West six significant weaknesses and five weaknesses for not responding to what it terms the "4-digit subfactors" of SOW 3.2.6 that DIA used in its evaluation. According to Constellation West these "4-digit subfactors" were not included in SOW 3.2.6 and there was no mention in SOW 3.2.6 that offerors would be rated for "each non-existent 4-digit subfactor with the 3-digit subfactor." In support of its argument, Constellation West points to the language in SOW 3.2.6 that "Cybersecurity and IA services include, *but are not limited to, . . .*" which preceded the list of items that DIA would ultimately treat as the "4-digit subfactors." (emphasis in original). According to Constellation West, this language indicated only that these were topics that "Cybersecurity and IA services *could* include," but not that proposals would be scored against all of the topics. (emphasis in original). Constellation West argues that DIA's actions "had the impact of penalizing CWI for not *specifically* responding to each topic that was turned into 4 digit subfactors," which "were only stated *generally* in a 3 digit subfactor of the RFP." (emphasis in original). Constellation West argues that its case is analogous to Dubinsky v. United States, 43 Fed. Cl. 243 (1999), in which the court found that evaluators had improperly used a four-tier rating system to rate offerors, rather than the three-tier system stated in the RFP.

Defendant asserts that Constellation West's argument "elevates form over substance." According to defendant, DIA's decision to assign four digit numbers to the elements of SOW 3.2.6 during the evaluation process did not affect the criteria upon which

DIA based the evaluation or introduce any new requirements to the SOW. Defendant argues that the criteria upon which DIA based its evaluation were identical to those criteria disclosed in the solicitation. Defendant further argues that the solicitation required offerors to address each of these criteria, pointing to language in the solicitation stating that offerors "shall provide evidence of the depth and breadth of their team's experience and details of their team's expertise on on-going and completed projects . . . with respect to all areas under SOW 3.2" and that "Cybersecurity and IA services include, but are not limited to" the elements in SOW 3.2.6. Finally, defendant distinguishes <u>Dubinsky</u>, arguing that the rating system used to evaluate proposals in <u>Dubinsky</u> contained a substantive standard for evaluation that was different than the substantive standard of the disclosed rating system.

The solicitation in the cases currently under consideration stated that "[i]nformation required for proposal evaluation that is not found in its designated volume may result in unfavorable proposal evaluation." With regards to Management/Technical portion of proposals, the solicitation required offerors to "provide evidence of the depth and breadth of their team's experience and details of their team's expertise on on-going and completed projects (as a prime or a subcontractor) with respect to <u>all areas</u> under SOW 3.2." (emphasis added). One of the areas under SOW 3.2 was SOW 3.2.6, which stated that:

> The Contractor shall provide diverse Cybersecurity and Information Assurance (IA) services . . . . <u>Cybersecurity and IA services include, but are not limited to,</u> policy development; security technical assessment; insider threat assessment; security architecture development; security engineering; certification and accreditation; security compliance (such as ICD 503 and ICD 705, DoDI 8500 IA controls and other relevant DoD and IC policies), IA training management in accordance with DoDD 8570.1, audit, assessment, and reporting services; Computer Network Defense Service Provider (CNDSP) and inspection services IAW DoDD 8530.1, Chairman of the Joint Chief of Staff Instructions (CJCSI) 6510.01E, and CJCSM 6510.01; vulnerability assessment and management; metrics consolidation and reporting (to include the Federal Information Security Management Act (FISMA) requirements); computer network defense (CND) operations, monitoring, and analysis; cybersecurity and IT systems and tools administration and maintenance; incident response, tracking, and resolution; cross-domain solutions support; inter-agency coordination; and PKI procedures and guidance.

(emphasis added).

The dictionary meaning of the word "include" is "[t]o contain as part of something." <u>Black's Law Dictionary</u> 880 (10th ed. 2014). Thus, the phrase "Cybersecurity and IA services include," followed by a list of topics, meant that the terms Cybersecurity and IA services contained each of the listed topics. The use of the modifying phrase "but are not limited to" after the word "include" indicates that the list of topics could have been a partial one, but definitely includes the items listed. <u>See</u> <u>id.</u> ("The participle *including* typically indicates a partial list . . . . But some drafters use phrases such as *including without*

*limitation* and *including but not limited to* — which mean the same thing.") (emphasis in original). Thus, the language of the solicitation put offerors on notice that their proposals would be evaluated on whether they "provide[d] evidence of the depth and breadth of their team's experience and details of their team's expertise on on-going and completed projects (as a prime or a subcontractor) with respect to" each one of the components listed in SOW 3.2.6 after the words "Cybersecurity and IA services include, but are not limited to." These items were precisely how Constellation West was evaluated. The following chart, a modified version of one provided by defendant, which compares the language contained in SOW 3.2.6 of the solicitation, the April 27, 2015 MFR, titled "Management/Technical Evaluation Process," explaining the components that SOW 3.2.6 was broken up into for evaluation purposes, and DIA's evaluation of Constellation West's Management/Technical proposal for each of the components of SOW 3.2.6 for which Constellation West was assessed a weakness or significant weakness, is instructive:

| SOW 3.2.6 of the Solicitation | April 27, 2015 MFR | Evaluation of Constellation West's Proposal |
|---|---|---|
| "policy development . . . certification and accreditation; security compliance (such as ICD 503 and ICD 705, DoDI 8500 IA controls and other relevant DoD and IC policies)" | "SOW 3.2.6.1 Policy Development; Security compliance (policies ICD 503/705, DOD 8500); Certification and accreditation" | "SOW 3.2.6.1 . . . . The Offeror's proposal describes an approach but lacks detail on experience providing cybersecurity information assurance (IA) policy development, security compliance and certification and accreditation (C&A) activities for on-going or completed projects." |
| "security technical assessment; insider threat assessment" | "SOW 3.2.6.2 Security technical assessment; Insider threat assessment" | "SOW 3.2.6.2 . . . . The Offeror's proposal lacks details on the Offeror's approach to security technical assessment and insider threat assessment, and lacks relevant details on experience for any past, or current projects." |
| "security architecture development; security engineering" | "SOW 3.2.6.3 Security architecture development; Security engineering" | "SOW 3.2.6.3 . . . . The Offeror's proposal details the Offeror's approach to security architecture development and engineering but lacks relevant details on experience for any past, or current projects." |
| "IA training management in accordance with DoDD 8570.1, audit, assessment, and reporting services" | "SOW 3.2.6.4 IA training management (DoDD 8570.1 audit/assessment/ reporting)" | "SOW 3.2.6.4 . . . . The Offeror's proposal lacks description of their depth and breadth of experience and details of their expertise on similar on-going and completed projects as defined in M-3.2.2 Sub-factor 2: Technical Experience and Expertise |

| | | mapped to functional areas listed in SOW.<br><br>The Offeror's proposal, pages 96-97, cites: '. . . The <u>Information Assurance Training</u> Team develops, maintains and improves user IT Security Awareness and role based training for personnel with IT Security related responsibilities. The Team also <u>provides reporting</u> for annual training requirements . . .'." (second and third omissions in original). |
|---|---|---|
| "Computer Network Defense Service Provider (CNDSP) and inspection services IAW DoDD 8530.1, Chairman of the Joint Chief of Staff Instructions (CJCSI) 6510.01E, and CJCSM 6510.01" | "SOW 3.2.6.5 Computer Network Defense Service Provider (CNDSP) & inspection services (DoD 8530.1 (CJCSI) 6510.01E, and CJCSM 6510.01)" | "SOW 3.2.6.5 . . . . The Offeror's proposal lacks significant detail and provides no information on an approach to or experience in providing <u>Computer Network Defense (CDN) Service Provider (SP) & inspection services</u> for on-going or completed projects." |
| "Vulnerability assessment and management; metrics consolidation and reporting (to include the Federal Information Security Management Act (FISMA) requirements)" | "SOW 3.2.6.6 Vulnerability assessment and management; Metrics consolidation and reporting (FISMA)" | "SOW 3.2.6.6 . . . . The Offeror's proposal lacks significant detail and provides no information on an approach to or experience in providing <u>vulnerability assessment, metrics consolidation and reporting</u> activities for on-going or completed projects." |
| "cybersecurity and IT systems and tools administration and maintenance " | "SOW 3.2.6.8 Cybersecurity and IT systems and tools admin and maintenance" | "SOW 3.2.6.8 . . . . The Offeror's proposal lacks significant detail and provides no information on an approach to or experience in providing Information Assurance <u>tools administration and maintenance</u> for on-going or completed projects." |
| "incident response, tracking, and resolution . . . inter-agency coordination" | "SOW 3.2.6.9 Incident response/tracking/ resolution; inter-agency coordination" | "SOW 3.2.6.9 . . . . The Offeror's proposal lacks description of their depth and breadth of experience and details of their expertise on similar on-going and completed projects as defined in M-3.2.2 Sub-factor 2: |

| | | Technical Experience and Expertise mapped to functional areas listed in SOW.<br><br>The Offeror's proposal, page 97, cites: '. . . . The Incident Response (IR) Team conducts formal investigation of security events and incidents that have been escalated by the SOC. The IR Team <u>record, [sic] tracks, contains, remediates and reports all incidents</u>. The IR Team facilitates and <u>coordinates intra and intra</u> [sic] <u>agency teams</u> as necessary until incident closure . . .'." (third omission in original). |
|---|---|---|
| "PKI procedures and guidance" | "SOW 3.2.6.10 PKI procedures and guidance" | "SOW 3.2.6.10 . . . . The Offeror's proposal lacks detailed information within, or does not seem to address <u>PKI procedures and guidance</u>." |
| "cross-domain solutions support" | "SOW 3.2.6.11 Cross-domain solutions support" | "SOW 3.2.6.11 . . . . The Offeror's proposal lacks details on the Offeror's approach to IA <u>cross domain solutions and support</u>, and lacks relevant details on any experience for a past or current project." |

(all emphasis added).

The chart shows that the criteria on which Constellation West was evaluated were identical, or substantially similar to, the components listed in the solicitation at SOW 3.2.6. While DIA did assign each of the components a new four digit code as part of the evaluation process, this did nothing to alter the substance of the components. Because the language in the solicitation required Constellation West to address each of SOW 3.2.6's components, DIA's decision to assign Constellation West weaknesses and significant weaknesses for failing to do so cannot be said to have been based on undisclosed criteria, regardless of how DIA chose to label the components during the evaluation process.

Constellation West is not helped by <u>Dubinsky v. United States</u>, 43 Fed. Cl. 243, as, in <u>Dubinsky</u>, the RFP stated that proposals would be evaluated against twenty three technical specifications listed in the RFP using a three-tier rating system—(+), (0) or (-)—in order to determine the offeror's score for a "technical requirements" factor. <u>See</u> <u>id.</u> at 247-48 & 248 n.11. In its evaluation, the government evaluated each of these specifications using a four-tier rating system—(++), (+), (0), or (-)—rather than the three

tier system described in the RFP. Id. at 247-48. The Dubinsky court found that the government's use of the four tier system was arbitrary and capricious because the FAR "does not grant contracting officers carte blanche to notify offerors of one rating system in the RFP and to then apply a different system during the evaluation of proposals." Id. at 267 n.56 (citing Clean Florida, Inc., B-233262, 88-2 C.P.D. ¶ 411 at 2 (Comp. Gen. Oct. 28, 1988); Idaho Norland Corp, B- 230598, 88-1 C.P.D. ¶ 529 at 3 (Comp. Gen. June 6, 1988)). Constellation West argues that the present case is analogous to Dubinsky because "contrary to the express language of the RFP, SOW 3.2.6, which was supposed to be evaluated as a 3 digit subfactor, was broken down into eleven 4 digit subfactors from topics that were mentioned in the subfactor in general terms." As discussed above, however, the components of SOW 3.2.6 that were assigned four digit numbers by DIA during its evaluation were stated explicitly in identical or almost identical form, albeit as part of a three digit description. Additionally, the express language of the solicitation did not require DIA to evaluate SOW 3.2.6 as a single sub-factor, but instead stated that offerors were to address "all areas under SOW 3.2," and that one of those areas, SOW 3.2.6, would "include" the components of SOW 3.2.6 to which DIA later assigned four digit numbers. Ultimately, the portion of Constellation West's proposal addressing SOW 3.2.6 was evaluated under the same substantive criteria stated in the solicitation. The effects of DIA's decision to assign four digit numbers to the components of SOW 3.2.6 during the evaluation process were not significant and did not impact the substance of the evaluation. Also important to the discussion is that all the offerors were evaluated using the same criteria and sub-criteria. See id. at 269-70 (finding that the government's decision to supplement one offeror's technical rating with two "bonus" scores based on criteria not stated in the solicitation improperly "created an unlevel playing field"). Therefore, the government's approach in Dubinsky of creating an entirely new rating system is distinct from DIA's evaluation of Constellation West's proposal, which conformed to the description in the solicitation. Moreover, the court in Dubinsky found that the procurement at issue "was mishandled from start to finish. It was riddled with violations of procurement regulations and arbitrary and capricious conduct by the contracting officer." Id. at 274. No such widespread wrongdoing has been alleged by Constellation West.

Constellation West also argues that Lab Corp. of America Holdings v. United States, 116 Fed. Cl. 643 (2014), and 360Training.com, Inc. v. United States, 106 Fed. Cl. 177 (2012), support its claim that DIA's use of four digit components to evaluate the portion of its application involving SOW 3.2.6 constituted the use of impermissible undisclosed criteria. In Lab Corp. of America Holdings, the VA used the number of "FSS [Federal Supply Schedule] test types listed" in offerors' proposals as the "predominant differentiator used in selecting" an awardee, even though "neither the RFQ nor SOW indicated that the VA would evaluate offerors' proposals based on the number of FSS test types listed" and the VA "insufficiently documented its technical evaluation." Lab Corp. of Am. Holdings v. United States, 116 Fed. Cl. at 651-52. In 360Training.com, the court stated, "the Court cannot discern the exact process OSHA used to evaluate the applications because there are many inconsistencies among the documents and the contemporaneous evaluations do not match OSHA's final conclusions." 360Training.com, Inc. v. United States, 106 Fed. Cl. at 191. The 360Training.com court's findings included that the solicitation did not disclose the applicant organization's probation status as an

eligibility requirement, id. at 194, and that the agency placed undue weight on past performance. See id. at 195. In both cases cited by Constellation West, proposals were evaluated on criteria that were not mentioned in or otherwise indicated by the solicitation. As noted above, in the current protest, the DIA solicitation made clear that offerors were required to address each of the components listed in SOW 3.2.6, including those for which Constellation West was ultimately assessed a weakness or a significant weakness. DIA's decision to assign four digit numbers to each of those components did not alter the substance of that requirement, the subject matter to be addressed, or otherwise introduce new evaluation criteria, and Lab Corp. of America Holdings and 360Training.com do not assist Constellation West.

*Prejudice*

The record demonstrates that DIA erred when it assigned one of the weaknesses to the Technical/Management portion of Constellation West's proposal, based on Section M-3.2.1.2e of the solicitation. As noted above, however, to prove its claim Constellation West also must show that it was prejudiced as a result of the error, i.e., "that there was a 'substantial chance' it would have received the contract award but for the error[ ]." Bannum, Inc. v. United States, 404 F.3d at 1353 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). Awards under the E-SITE contract were awarded based on a best-value analysis. Under the terms of the solicitation, DIA's best-value analysis was based on proposals' prices and the ratings received for the Management/Technical and Past Performance Factors. Constellation West does not allege that either the total evaluated price, $[redacted], or the Past Performance rating, Satisfactory Confidence, for its proposal were incorrectly determined. Therefore, to show that the error could have affected DIA's best-value analysis, let alone the award of contracts, Constellation West must show that the error affected the Management/Technical rating it received. The elements of the Management/Technical portion of Constellation West's proposal were assigned no significant strengths, fifteen strengths, twenty six weaknesses and six significant weaknesses. It therefore received an overall rating of Marginal, meaning its Management/Technical "proposal has one or more weaknesses which are not offset by strengths." The next highest possible rating Constellation West could have received for the Management/Technical Factor was Acceptable, which was assigned if "[s]trengths and weaknesses [under the Factor] are offsetting." Had Constellation West not been assigned a weakness based on Section M-3.2.1.2e, it would have received fifteen strengths against twenty five weaknesses and six significant weaknesses under the Management/Technical portion of its proposal. Constellation West's strengths still would not have come close to offsetting its weaknesses, and, thus, it still would have received a Marginal rating for the Management/Technical Factor. Absent the error, therefore, DIA's best-value analysis would not have changed and Constellation West would not have

received an award.[13] Constellation West, thus, has failed to show that it was prejudiced as a result of DIA's actions and its protest fails.[14]

## Sev1Tech

In case number 15-923C, protestor Sev1Tech alleges that DIA acted arbitrarily when it disqualified Sev1Tech's proposal on the grounds that it was unable to determine Sev1Tech's intended price. In particular, Sev1Tech argues that DIA's failure to evaluate Sev1Tech's proposal was arbitrary because Sev1Tech's intended price was obvious on the face of its proposal. Alternatively, Sev1Tech argues that, even if there were missing information in Sev1Tech's proposal, DIA's refusal to exercise its discretion to waive what Sev1Tech characterizes as a non-material, "minor irregularity" under Section L.3 of the solicitation and FAR 52.215-1(f)(3) was arbitrary. Also, in the alternative, Sev1Tech argues that DIA's failure to request a clarification and give Sev1Tech the opportunity to correct a "minor or clerical" error pursuant to FAR 15.306(a)(2) and various provisions of the solicitation, as it did with the seven other proposals with missing price information, was an abuse of discretion and amounted to impermissible disparate treatment. Defendant denies all of Sev1Tech's allegations, arguing that Sev1Tech was ineligible for an award because it did not comply with the solicitation's instruction to offer rates for all labor categories and that DIA's decision not to request a clarification from Sev1Tech was based on careful analysis and reasonable. Defendant also denies that DIA's decision not to seek clarification from Sev1Tech amounted to impermissible disparate treatment.

*DIA's Refusal to Evaluate Sev1Tech's Proposal*

Initially, Sev1Tech argues that DIA's failure to evaluate its proposal on the grounds that its pricing information was incomplete was arbitrary because "DIA had all the information it needed in order to determine Sev1Tech's price." According to Sev1Tech,

---

[13] This conclusion is consistent with the best-value analysis that DIA, acting through the SSAC, actually performed. The SSAC found that Constellation West's proposal did not represent the best value "due to its significant and other weaknesses" under the Management/Technical Factor. In particular, it noted that the weaknesses assigned the proposal under Management/Technical Sub-factor 1 "clearly outweighed" the assigned strengths and that the weaknesses and significant weaknesses assigned under Sub-factor 2 outweighed the assigned strengths. Without the weaknesses assigned under Section M-3.2.1.2e, an element of Sub-factor 1, the four weaknesses Constellation West would have received under Sub-factor 1 one would still outweigh its two strengths. Further, the ratio of twenty one weaknesses and six significant weaknesses to thirteen strengths received by Constellation West's proposal under Sub-factor 2 would remain unchanged. Thus, the SSAC's best-value analysis with regard to Constellation West's proposal was not affected by the error under Section M-3.2.1.2e.

[14] At oral argument, counsel for Constellation West conceded that it could not show that Constellation West would have received the procurement without showing that the five weaknesses and six significant weaknesses its proposal received under SOW 3.2.6 were erroneous.

DIA could have determined the prices for the [redacted], admittedly, missing cells in its pricing spreadsheet based on information in the price volume narrative of Sev1Tech's proposal, which stated that Sev1Tech was "keeping the labor escalation at [redacted]% per year over contract life," and because Sev1Tech allegedly "used a [redacted]% escalation rate (with rounding) through most of its proposal." Sev1Tech argues that DIA, therefore, could have applied a [redacted]% escalation rate to project the intended labor rates for the missing cells, or, alternatively, treated the blank cells as "zeros," which it argues also would have been reasonable.

Defendant begins by arguing that Sev1Tech has conceded that it did not comply with the solicitation's explicit instruction that offerors "must" address all aspects of Section M relating to price in the solicitation and include ceiling rates for all proposed option years in the pricing spreadsheet. Defendant then argues that DIA had no obligation to attempt to fill in Sev1Tech's missing labor rates. Defendant further argues that DIA, nonetheless, did make a reasonable attempt to discern the labor rates for Sev1Tech's missing cells, but was unable to do so after its analysis determined that Sev1Tech's proposal did not actually consistently apply a [redacted]% escalation rate. Defendant dismisses Sev1Tech's suggestion that DIA could have treated the missing cells as zeros on the grounds that there is no evidence in Sev1Tech's proposal that it intended to perform work at no cost to the government and that, thus, Sev1Tech would have potentially been entitled to seek a subsequent price adjustment had DIA done so.

The solicitation warned offerors, repeatedly, that incomplete proposals, particularly incomplete pricing proposals, risked having the proposal rejected. Section M-1.3 states that: "If a proposal does not substantially and materially comply with all of the requirements of this solicitation, it will be rejected and not considered for further evaluation." (emphasis added). The portion of the solicitation dealing with pricing, Section L-4.5, stated that offerors "must ensure that all aspects of the Section M, Price pertaining to the solicitation are addressed," and that the price volume of their proposals "must include the ceiling rates for the base period and all proposed options per the [pricing] spreadsheet." (emphasis added). Any doubts as to the meaning of this language should have been obviated by the following "Question & Answer" included with the April 16, 2014 amendment to the solicitation:

[Question:] Is offeror required to provide the ceiling rates for all group [sic] for all labor categories or just for the group within its physical location and labor categories available?

[Answer:] L-4.5 C answers your question. We require all pricing for completeness.

(emphasis added). Sev1Tech, by its own admission, did not include ceiling rates for all proposed option years in the pricing spreadsheet. Therefore, under the terms of the solicitation, DIA was within its rights to reject Sev1Tech's proposal. Sev1Tech cannot point to a reason why DIA would have had an obligation to infer its missing rates from other information in its proposal, absent the existence of disparate treatment, which is discussed below. As defendant argues, "an agency is not required to sift through a

proposal in order to identify information that the offeror failed to include in the correct place." ST Net, Inc. v. United States, 112 Fed. Cl. 99, 110 (2013) (citing IBM Corp. v. United States, 101 Fed. Cl. 746, 758–59 (2011) (holding that agency "was not required to search for additional information to assist [offeror]")).

Sev1Tech cites to Dana Corp. v. United States, 200 Ct. Cl. 200, 470 F.2d 1032 (1972), in support of its argument that DIA could have chosen to interpret the missing cells in Sev1Tech's proposal as an offer to perform the work at either at a price [redacted]% greater than the previous cells or at a rate of zero, i.e., for free. In Dana Corp., a contractor offered three specific prices based on three possible packaging methods for equipment that was to be shipped to the government. Dana Corp. v. United States, 200 Ct. Cl. at 205-06. The government treated these three prices as alternative offers and noted its choice of one of them in its acceptance. See id. at 206, 214-15. By contrast, the contractor believed it was setting out three alternatives and that the precise method to be used would be determined by future circumstances. See id. at 206, 214. The court noted that although the contractor "undoubtedly did not intend to offer the [government] a choice between three prices," the nature of the proposal must be determined objectively rather than on subjective intent. Id. at 214. Because the contractor failed to prove that the packaging method was dependent on the future circumstances, as it alleged, or that the government so believed, the court found that the government's interpretation of the proposal as offering a choice between three prices "was not only a reasonable interpretation but probably the only reasonable one." Id.

Dana Corp. is distinguishable from the present case in that Sev1Tech's offer, the pricing spreadsheet, did not provide multiple prices for missing cells, but provided none whatsoever. Further, the central teaching of Dana Corp., that the nature of an offer is to be determined objectively based on the evidence available to the offeree at the time the offer is made, cuts against Sev1Tech's argument. In the present case, the objective information DIA had to determine the labor rates Sev1Tech intended to offer for the missing cells was the statement in Sev1Tech's proposal that general economic trends would allow it to "keep[ ] the labor escalation at [redacted]% per year over contract life" and the labor rates Sev1Tech provided for the other non-missing cells. After finding that Sev1Tech had not consistently applied a [redacted]% escalation rate throughout the non-missing cells, and, indeed, that certain of the escalation rates varied by substantially more than [redacted]%, findings which Sev1Tech does not dispute before this court, DIA, not unreasonably, concluded that it could not determine that Sev1Tech intended to apply the [redacted]% escalation rate to the missing cells to complete the missing pricing information. As to Sev1Tech's claim that it would have been reasonable for DIA to treat the missing cells as zeros, Sev1Tech offers no evidence that it would have been reasonable for DIA to assume that Sev1Tech would have offered to provide labor for the [redacted] missing cells for free, particularly in light of the fact that Sev1Tech proposed labor rates greater than zero for every other item in the pricing spreadsheet. Further, as defendant points out, had DIA made assumptions about Sev1Tech's missing labor rates based on the, at best, inconclusive evidence DIA had before it, Sev1Tech would not necessarily have been bound by the rates DIA had chosen. Instead, Sev1Tech, potentially, could have sought reformation of the contract based on the doctrine of unilateral mistake. See Bromley Contracting Co. v. United States, 794 F.2d 669, 672

(Fed. Cir. 1986) (noting that a contractor may obtain reformation of a contract after the contract has been awarded on the grounds of unilateral mistake in circumstances in which the contractor's bid contained a "'clear cut clerical or arithmetical error'" such as the "[c]omplete omission of a cost item from the bid calculation" (quoting Ruggiero v. United States, 190 Ct. Cl. 327, 420 F.2d 709, 713 (1970)). Thus, DIA's decision not to infer any particular price for the [redacted] cells Sev1Tech left empty was not arbitrary.

*DIA's Refusal to Waive the Missing Cells as a "Minor Irregularity"*

Sev1Tech next argues, in the alternative, that DIA acted arbitrarily in failing to exercise its discretion under Section L.3 of the solicitation and FAR 52.215-1(f)(3), which both state that: "The Government may waive informalities and minor irregularities in proposals received." Sev1Tech alleges that the [redacted] blank cells constituted a minor irregularity and were not material because they had only a "tiny" impact on Sev1Tech's overall price, involving only [redacted] of 2,890 cells in the pricing spreadsheet. According to Sev1Tech, had it included the rates it allegedly intended to include for these [redacted] cells, using its [redacted]% escalation rate, Sev1Tech's total price of $[redacted] would have increased by only $[redacted], i.e., "8/1,000$^{ths}$ of one percent." Sev1Tech also argues that price "[c]learly" was "of minimal importance in DIA's evaluation" because there was a "huge range" of total evaluated prices in the proposals accepted by DIA, with the highest awarded price, $2,317,934,116.00, more than twice the lowest awarded price, $1,121,408,539.00.

Defendant argues that the requirement that offerors offer ceiling rates in all labor categories for all contract periods was material because failure to comply would have a non-negligible effect on price. According to defendant, unless all rates in the pricing spreadsheet were complete, DIA could not calculate a total proposal price and make a best-value determination. Defendant also argues that allowing offerors to offer incomplete pricing spreadsheets, and, thereby, avoid committing to price ceiling rates, would frustrate DIA's purpose for requiring offerors to state labor rates up front, which was, as stated in the E-SITE Acquisition Plan, "to ensure competitive pricing." Defendant rejects Sev1Tech's argument that its omissions were minor because they represented only a small percentage of its total price on the grounds that the price information was important to DIA's overall evaluation of Sev1Tech's offer.

The government has no obligation to waive a proposal's defect relating to a material term. See Bus. Integra, Inc. v. United States, 116 Fed. Cl. 328, 337 (2014). "A solicitation term is 'material' if failure to comply with it would have a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured." Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 (Fed. Cir. 2009). While, as Sev1Tech points out, the solicitation stated that price was not the most important factor in selecting awardees, the fact remains that it was one of only three stated factors that DIA was to consider in making its best-value determination for small business proposals. Indeed, it is difficult to understand how a best-value determination could be made without at least some consideration of price. Proposals were to be evaluated, and compared, on the basis of their total price, which was to be determined by multiplying each of the labor rates

provided by the offerors by a corresponding quantity of hours determined by the government for each labor category. Thus, DIA's inability to determine Sev1Tech's labor rates for the [redacted] missing cells from the face of its proposal had a non-negligible impact because it meant that a total price could not be determined for Sev1Tech's proposal and, therefore, the proposal could not be evaluated in the manner described in the solicitation. Further, as defendant points out, DIA's purpose for requiring offerors to commit to labor rate ceilings in the pricing spreadsheet was to ensure "competitive pricing over the course of the contract." This goal would have been frustrated by allowing Sev1Tech to omit labor rates for even a small number of the required labor categories. See Bus. Integra, Inc. v. United States, 116 Fed. Cl. at 336 (finding that a solicitation's purpose of "providing a basis for robust competition within a pool of small businesses that are ready and willing to provide" certain services would be frustrated if its requirement that offerors commit to ceiling rates in all labor categories for all years were to be considered immaterial).

*DIA's Decision Not to Seek a Clarification from Sev1Tech and Disparate Treatment*

Sev1Tech also alleges that DIA acted arbitrarily when it declined to seek a clarification from Sev1Tech regarding its missing cells pursuant to FAR 15.306(a)(2), which states:

> If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.

FAR 15.306(a)(2). In its April 23, 2015 MFR regarding Sev1Tech's missing prices, DIA decided not to seek clarification from Sev1Tech, stating: "It is . . . the Government's opinion that this is a material deficiency and is not a minor or clerical error that can be resolved during clarification since the intended offer is not apparent on the face of the proposal." Sev1Tech recognizes that that FAR 15.306(a)(2), as well as the three references to clarifications in the solicitation in Sections L.3, M.2b, and M-1.8 are worded permissively. Sev1Tech, however, cites BCPeabody Construction Services, Inc. v. United States, 112 Fed. Cl. at 512, for the proposition that this court will review such discretion to ensure that it was reasonably based on the particular circumstances of the procurement. Sev1Tech argues that the present case involves an abuse of discretion because Sev1Tech's omissions were "obviously" clerical errors and any correction could have been tested against its statements in its price volume and the other cells in the spreadsheet.

As conceded by Sev1Tech, FAR 15.306(a)(2) is worded permissively, providing that the government "may" grant offerors the opportunity to provide clarifications of "minor or clerical errors." Indeed, "[t]his court has repeatedly recognized the permissive nature of this regulation in the context of negotiated procurements." ST Net, Inc. v. United States, 112 Fed. Cl. at 109-10 (citing Mil–Mar Century Corp. v. United States, 111 Fed. Cl. 508, 534–35 (2013); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 715 (2010);

<u>Chenega Mgmt., LLC v. United States</u>, 96 Fed. Cl. 556, 586 (2010)). While this discretion may not be total, at the very least it means that the government has no obligation to seek clarifications when it justifiably determines that an offeror has made a material omission. <u>See</u> <u>Bus. Integra, Inc. v. United States</u>, 116 Fed. Cl. at 337; <u>ST Net, Inc. v. United States</u>, 112 Fed. Cl. at 110-11. The case cited by defendant, <u>BCPeabody Construction Services, Inc. v. United States</u>, 112 Fed. Cl. 502, is not to the contrary, as it involved an omission relating to the offeror's past work experience that "did not impair the contracting officer's ability to evaluate [the offeror's] fitness or price quote for the contract." <u>Id.</u> at 512. Indeed, <u>BCPeabody</u> explicitly distinguished <u>ST Net, Inc. v. United States</u>, which held that the government had reasonably exercised its discretion not to seek a clarification, on the grounds that "in *ST Net*, the protestor had omitted material pricing information." <u>Id.</u> at 511 (citing <u>ST Net, Inc. v. United States</u>, 112 Fed. Cl. at 109-10). As discussed above, Sev1Tech's failure to complete the pricing spreadsheet was reasonably considered by the agency to be a material error, which prevented DIA from evaluating the price of its proposal in the best-value analysis in the manner described in the solicitation. Because the omission was material, DIA did not have an obligation to request a clarification from Sev1Tech and its decision not to do so was not arbitrary, capricious, or an abuse of discretion. <u>See</u> <u>ST Net, Inc. v. United States</u>, 112 Fed. Cl. at 111 ("Given the clear importance DHS placed on offerors carefully and properly providing the required information, the court cannot say that DHS was obligated under FAR 1.602–2(b) and 15.306(a) to seek clarifications where information was missing or wrong, or that DHS's decision to forgo clarifications was arbitrary, capricious or an abuse of discretion.").

Sev1Tech also argues that DIA's decision to request a clarification from the other seven offerors, two of whom were ultimately awarded contracts, whose proposals contained incomplete pricing spreadsheets, but not from Sev1Tech, amounted to impermissible, disparate treatment. In its April 27, 2015 MFR titled "Contracting Officer's Record of Decisions to Clarify Incomplete Price Volumes for the Enhanced Solutions for the Information Technology Enterprise (E-SITE) solicitation," DIA stated that, for these seven other offerors, "the Government could ascertain the Offerors' intended prices by calculating the intended escalation rates to the hundredth of the percentage. . . . The intended prices were apparent from the face of the proposal. Clarifications were conducted with these Offerors." The memorandum went on to state:

> 3. The Government was unable to ascertain the intended unit ceiling prices for the Offeror Sev1Tech.

> 4. The Government attempted to estimate the missing unit ceiling prices for the Offeror Sev1Tech using three different estimation methods. All three methods were unsuccessful.

>> a. The price proposal summary was researched, and the Offeror stated that and [sic] escalation of [redacted]% was chosen. When the Government attempted to verify this for the Systems Architect labor category, escalation rates varied from [redacted]% to [redacted]%.

b. Next, five random overseas labor categories and five CONUS labor categories were selected for analysis from Sev1Tech's Price spreadsheet. It was found, with consideration for minor rounding errors being acceptable, that the majority of the labor categories randomly sampled yielded an approximate [redacted]% escalation as proposed. However, there were numerous anomalies found within multiple labor categories and at least one group/location within each of those labor categories that deviated from the proposed [redacted]% escalation. There was no discernable pattern among the randomly sampled labor rates for the Government to determine exactly what the escalation for all incomplete rates was intended to be.

c. Lastly, escalation rates for all Group 5 labor category ceiling rates were estimated to determine if there was a discernable pattern among those rates. It was again found that the majority of rates in the Group 5 location adhered to the proposed [redacted]% escalation but there were nine (9) instances of anomalies within the Group 5 escalation rates found. The escalation rates determined to be anomalies ranged from [redacted]% to [redacted]%. There was no discernable pattern among the Group 5 escalation rates for the Government to determine exactly what the escalation for all the incomplete rates was intended to be.

5. Based on the inconsistencies in escalation rates among all three methods, the Government determined that Sev1Tech's intended price could not be ascertained from the face of the proposal. The Contracting Officer determined this to be a material deficiency and did not conduct clarifications with Sev1Tech.

Sev1Tech argues that this explanation for the different treatment of Sev1Tech and the other seven offerors with missing labor rates was neither coherent nor reasonable and, therefore, DIA abused its discretion in failing to request a clarification from Sev1Tech. As evidence of DIA's alleged, unequal treatment, Sev1Tech points to findings DIA made regarding AiNET, DKW, and Progressive. With respect to AiNET, Sev1Tech notes that DIA found that "a large majority" of the overseas labor rates it sampled did not adhere to the [redacted]% escalation rate for which DIA ultimately requested a clarification, and that AiNET, unlike Sev1Tech did not include a narrative statement in its proposal stating its intended escalation rate. With respect to DKW, Sev1Tech argues its situation and DKW's were "identical, except that DKW had many more blank cells."[15] DKW provided an escalation rate in its proposal of [redacted]%, but, according to Sev1Tech, in the non-blank cells, DKW's escalation rate was sometimes more than [redacted]%, and sometimes less than [redacted]%. With respect to Progressive, Sev1Tech argues that, unlike for itself, DIA found that there was no escalation rate pattern for the majority of the non-missing labor rates. Sev1Tech does not specifically address

---

[15] As noted above, DKW's proposal was missing [redacted] cells.

the other four offerors of the seven offerors from which clarification was sought, i.e., Jupiter, RiiTE, Sotera, and Syneren, whose proposals also contained missing labor rates. Sev1Tech also argues that any clarification request to it from DIA would not have amounted to impermissible discussions, rather than clarifications, because, Sev1Tech argues, the omissions were minor or clerical errors and the United States Court of Federal Claims has "repeatedly and expressly stated that agency communications with an offeror to allow correction of minor mathematical errors in an offeror's proposal are clarifications and not discussions." (citing <u>DynCorp Int'l LLC v. United States</u>, 76 Fed. Cl. at 545; <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d at 1333; <u>Int'l Res. Recovery, Inc. v. United States</u>, 64 Fed. Cl. 150, 162 (2005). Sev1Tech argues that, based on this precedent, the government cannot argue that asking Sev1Tech whether the [redacted]% escalation rate it allegedly stated in its price volume was meant to apply to the [redacted] missing cells would have amounted to anything but a permissible clarification under FAR 15.306(a)(1).

Defendant responds by arguing that DIA carefully examined the price proposals of each of the eight offerors with missing labor rates to determine whether the intended rates for the missing cells were "apparent form the face of the proposal." DIA allegedly did so using the same methodology for each of the eight, looking to see if there were consistent patterns in the offerors' escalation rates. According to defendant, in the case of each of the seven other offerors, DIA was able to reasonably conclude that there was sufficient consistency to calculate the intended rates for the missing cells. In the case of Sev1Tech, however, defendant argues that DIA reasonably concluded that they were not able to make the necessary calculations because of the "anomalies" in Sev1Tech's escalation rates DIA discovered applying its methodology. According to defendant, DIA reasonably concluded it could not determine Sev1Tech's missing prices from the face of its proposal as it could for the other seven offerors, and, therefore, Sev1Tech was not treated disparately vis-à-vis any other offeror.

Defendant cites to GAO decisions which have "held that when missing prices are not 'apparent from the face of the proposal,' agencies cannot allow offerors to fill-in the missing prices through 'clarifications,' pursuant to FAR 15.306(a), but rather, allowing offerors to fill-in the missing prices in this circumstance would constitute 'discussions.'" (citing <u>gMg Mgmt., Inc.</u>, B-409628.2, 2014 CPD ¶ 206, 2014 WL 3427148, at *3 (Comp. Gen. July 8, 2014); <u>Manthos Eng'q</u>, LLC, B-401751, 2009 CPD ¶ 216, 2009 WL 3723138, at *2 (Comp. Gen. Oct. 16, 2009)). The <u>gMg Mgmt., Inc.</u> case, a recent GAO decision, involved circumstances closely analogous to those of the present case. There, as in the above captioned case, the solicitation required offerors to complete a pricing spreadsheet with proposed rates for various labor categories, and a disappointed offeror inadvertently omitted rates for a number of cells in the version of spreadsheet it submitted with its proposal. <u>See</u> gMg <u>Mgmt., Inc.</u>, 2014 WL 3427148, at *1-2. The GAO held that, because it was not clear "from the face of the proposal" what rates the offeror, gMg, intended to propose for the omitted cells in pricing spreadsheet, "allowing gMg to correct its proposal would represent the correction of a material proposal defect and, therefore, would have constituted discussions." <u>Id.</u> at *3. The court also notes that the GAO's "from the face of the proposal" standard was cited approvingly by the United States Court of Federal Claims in an opinion cited by Sev1Tech. <u>See</u> <u>DynCorp Int'l LLC v. United States</u>, 76 Fed. Cl. at 545 ("'An agency may allow an offeror to correct a clerical error in a cost or price

proposal through clarifications, as opposed to discussions, where the existence of the mistake and the amount intended by the offeror is clear from the face of the proposal.'" (quoting IPlus, Inc., B298020, 2006 WL 1702640, at *4 (Comp. Gen. June 5, 2006))). Defendant argues that, even if the court does not follow the GAO's decisions on this issue, it was "inherently reasonable" for DIA to have followed GAO precedent because it would have provided disappointed protestors with a viable protest ground at the GAO, and probably in this court as well, which according to defendant, treats GAO decisions as "expert opinions," quoting Am. Auto Logistics LP v. United States, 117 Fed. Cl. 137, 182 (2014), a case decided by the undersigned judge.[16] The court agrees that DIA exercised its discretion in a reasonable and not arbitrary manner, when, after trying unsuccessfully to fill in the missing cells, DIA declined to offer Sev1Tech an opportunity to clarify its offer.

As to the protestor's disparate treatment argument, clearly, "it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. at 383 (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000) (citing cases)); see also Chenega Mgmt., LLC. v. United States, 96 Fed. Cl. at 585 ("[U]nequal treatment claims are the 'quintessential example of conduct which lacks a rational basis.'" (emphasis in original) (quoting Hunt Building Co., Ltd. v. United States, 61 Fed. Cl. 243, 273)). "Equal treatment, however, does not require that all proposals be treated the same." Chenega Mgmt., LLC. v. United States, 96 Fed. Cl. at 585 (citing FAR 1.102–2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.")). Instead, "'an agency action is arbitrary when the agency offered insufficient

---

[16] While it is true that the undersigned reviews with respect GAO decisions and the expertise offered, it is also true that this court is not bound by decisions of the GAO. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d at 1038 n.4 (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests.")); Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. at 230 n.2; Orion Tech., Inc. v. United States, 102 Fed. Cl. 218, 229 n.17 (2011) ( "While the decisions of the Comptroller General and the boards of contract appeals are not binding on the Court of Federal Claims, their analyses may be instructive."), aff'd, 704 F.3d 1344 (Fed. Cir. 2013); see also Thompson v. Cherokee Nation of Oklahoma, 334 F.3d 1075, 1084 (Fed. Cir. 2003) ("[T]he opinions of the Comptroller General . . . while not binding, are 'expert opinion[s], which we should prudently consider.'" (quoting Delta Data Sys. Corp. v. Webster, 744 F.2d 197, 201 (D.C. Cir. 1984))), aff'd and remanded sub nom. Cherokee Nation of Oklahoma v. Leavitt, 543 U.S. 631 (2005); Glenn Def. Marine (Asia) PTE Ltd. v. United States, 97 Fed. Cl. 568, 577, dismissed, 459 F. App'x 906 (Fed. Cir. 2011); Global Computer Enters., Inc. v. United States, 88 Fed. Cl. 350, 412 (2009) ("'Although not binding on this court, GAO opinions are properly used for information and guidance, given the GAO's experience and expertise.'" (quoting Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 232 (2008))); Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 746 (2008); Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 623 (2005).

reasons for treating similar situations differently.'" <u>Redland Genstar, Inc. v. United States</u>, 39 Fed. Cl. 220, 234 (1997) (quoting <u>Transactive Corp. v. United States</u>, 91 F.3d 232, 237 (D.C. Cir. 1996)).

In its April 27, 2015 MFR, DIA stated that it had found Sev1Tech's intended prices for its missing cells were not apparent on the face of Sev1Tech's proposal after it had unsuccessfully "attempted to estimate the missing unit ceiling prices for the Offeror Sev1Tech using three different estimation methods." The three methods, as described in the April 27, 2015 MFR, were as follows: 1) the escalation rates used in the same labor category and geographic location as the missing prices were examined to determine if they were the same as the escalation rates stated in the narrative of the offeror's price volume (Same Labor Category Method); 2) five random overseas and five random United States labor categories were examined to determine if there was a discernable escalation rate pattern and if it was the same as the stated escalation rate (Random Labor Categories Method); and 3) the escalation rates for all labor categories within the same geographic location as the missing cells were examined to determine if there was a discernable pattern and if it was same as the stated escalation rate (Same Geographic Area Method). An examination of the MFRs that DIA prepared for each of the eight proposals with missing pricing cells, including Sev1Tech's proposal, demonstrates that DIA consistently applied the same three methods to evaluate each of the proposals, with the exception that, for those offerors that did not state an escalation rate in their pricing proposal, DIA looked to see if a pattern existed. For all offerors except Syneren and Sev1Tech, DIA discerned a consistent application of a single escalation rate or a pattern of escalation rates using at least one of these methods. In the MFR prepared for Syneren's proposal, DIA noted that Syneren was missing pricing cells for two different labor categories: System Administrator in the U.S. Group 4 location and Network Engineer in the United Kingdom location. With regard to the missing System Administrator cells, DIA determined that all three methods showed Syneren had applied a consistent escalation rate that was consistent with the rate stated in Syneren's proposal. With regard to the missing Network Engineer cells, DIA was not able to discern a consistent pattern of escalation rates using the first two methods. Using the Same Geographic Area Method, DIA found "an apparent lack of consistency within the United Kingdom labor rates," but that the escalation rate used for all option year four cells was [redacted]%. Because the missing labor rates all came from option year four, DIA determined Syneren intended to use a [redacted]% escalation rate.

In the April 23, 2015 MFR prepared for Sev1Tech's proposal, however, DIA found that it was not able to discern Sev1Tech's intended escalation rate for the missing cells using any of the three estimation methods employed. Although the vast majority of escalation rates were consistent with Sev1Tech's stated rate of [redacted]%, using each of three methods there were at a number of what DIA referred to as "anomalies," escalation rates significantly greater or less than [redacted]%. The following chart, prepared by the court, summarizes DIA's findings described in the MFRs for each of the eight offerors using each of the three estimation methods (the escalation rates DIA found to be consistently applied are highlighted in gray):

| Offeror | # of Miss- ing Cells | Stated Escala- tion Rate | Same Labor Category Escalation Rates | Random Labor Categories Escalation Rates | Same Geographic Area Escalation Rates |
|---|---|---|---|---|---|
| **Sev1Tech** | [re-dact-ed] | [redact-ed]% | [redacted]% to [redacted]%, with one anomaly of [redacted]% | Majority [redacted]%, but "numerous anomalies . . . within multiple labor categories," between [redacted]% and [redacted]% | Majority [redacted]%, but nine "anomalies" between [redacted]% and [redacted]% |
| **AiNET** | [re-dact-ed] | [redact-ed] | All [redacted]% | "[L]arge majority" [redacted]% | All [redacted]% |
| **DKW** | [re-dact-ed] | [redact-ed]% | All [redacted]% to [redacted]% | All [redacted]% | All [redacted]% |
| **Jupiter** | [re-dact-ed] | [redact-ed] | [redacted]%, N/A,[17] N/A, N/A | All [redacted]%, [redacted]%, [redacted]%, [redacted]% | All [redacted]%, [redacted]%, [redacted]%, [redacted]% |
| **Progres- sive** | [re-dact-ed] | [redact-ed]% | [redacted]% to [redacted]%, [redacted]% to [redacted]% [redacted]% to [redacted]%, [redacted]% to [redacted]% | "[V]aried between the different option years, labor categories, and locations." | All [redacted]%, [redacted]%, [redacted]%, [redacted]% |
| **RiiTE** | [re-dact-ed] | [redact-ed]%, [redact-ed]%, [redact-ed]%, [redact-ed]% | [redacted]%, N/A, N/A, [redacted]% | All [redacted]%, [redacted]%, [redacted]%, [redacted]% | All [redacted]%, [redacted]%, [redacted]%, [redacted]% |

---

[17] N/A = No data available.

| Sotera | [re-dact-ed] | [redact-ed]% | All [redacted]%, [redacted]%, [redacted]%, [redacted]% | "[V]aried between the different option years, locations, and groups" | All [redacted]%, [redacted]%, [redacted]%, [redacted]% |
| Syneren: System Admin-istrator, U.S. Group 4 | [re-dact-ed] | [redact-ed] | All [redacted]% | All [redacted]% | All [redacted]% |
| Syneren: Network Engineer, United Kingdom | [re-dact-ed] | [redact-ed] | [redacted]%, [redacted]%, [redacted]%, N/A | Majority [redacted]%, [redacted]%, [redacted]%, [redacted]%; however "a number of rates . . . did not follow this pattern and appeared to be random in nature" | Almost all [redacted]%, [redacted]%, [redacted]%, [redacted]%; however, one labor category "followed a straight [redacted]% escalation rate between all levels and option years." |

To reach its conclusion, DIA applied consistent evaluation methods to each of the eight offerors to determine if the values of their missing labor rates could be determined "from the face of the proposal." Based on these findings, DIA determined that the intended prices for the missing price cells for the other seven, non-Sev1Tech, offerors could be determined "from the face of" their proposals using the escalation rates or pattern calculated with at least one of the three estimation methods. For Sev1Tech, however, DIA determined that "[b]ased on the inconsistencies in escalation rates among all three [estimation] methods" Sev1Tech's intended price could not be estimated "from the face of" its proposal. The clarification request sent to the other seven offerors, but not to Sev1Tech, had only two questions as follows:

**Clarification 1.** The Government found [ ] individual labor category rate[s] [was/were] not proposed. [Describes missing rates]

**Question:** Did you intend to provide pricing for [this/these] cell[s]? YES or NO

(**Note:** If the response is NO, then a response is not required to be provided for Clarification 2.)

> **Clarification 2.** Based on the information provided in your proposal, the Government believes you intended to propose [an] escalation rate[s] of [ ]%. Using [this/these] escalation rate[s], it is apparent to the Government that you intended to propose the rates identified below.
>
> **Question:** Is the pricing that you intended to propose correctly listed in the table below? YES or NO[18]

(emphasis and capitalization in original). The seven other offerors were not given any opportunity to provide any further information. It was because DIA concluded that, while it could project the intended values for the seven offerors from whom it eventually requested clarifications, it could not do so for Sev1Tech. Therefore, as noted in the April 23, 2015 MFR, DIA did not request a clarification from Sev1Tech because it was concerned that, due to its inability to determine Sev1Tech's intended rates for its missing cells, the types of answers necessary for the evaluation would constitute "discussions," which were excluded by the solicitation, and would not be clarifications, which were allowed by the solicitation and FAR 15.306(a)(2).

Based on the facts presented, it was not unreasonable or arbitrary for DIA to have concluded that it must limit its clarifications requests to offerors whose missing pricing information was apparent "from the face of the proposal." The record before the court also demonstrates that, during its evaluation, DIA attempted to fill in the missing labor rates in a uniform manner for all eight offerors at issue in the case. Although Sev1Tech was not given an opportunity to clarify, that decision was based on a studied, consistent, analytical approach, after which DIA concluded that it could not determine Sev1Tech's intended rates for its missing cells based on the contents of its price proposal. Although protester clearly disagrees, and the results may seem harsh to Sev1Tech, DIA exercised its discretion, perhaps even in a generous attempt, to give each of the eight offerors the benefit of trying to discern their missing price information from the balance of their proposals. Based on all of the above discussions, the court concludes that DIA did not act arbitrarily, capriciously, or not in accordance with the law when it declined to offer Sev1Tech an opportunity to answer the two clarification questions sent to the seven other offerors.

## CONCLUSION

In case number 15-876C, DIA did not base its evaluation of protestor Constellation West's proposal improperly on unstated criteria and its error in assigning one weakness to Constellation West's proposal did not prejudice Constellation West. Therefore, Constellation West's motion for judgment on the administrative record is **DENIED** and defendant's cross motion is **GRANTED**. Constellation West's complaint is **DISMISSED**.

In case number 15-923C, DIA did not act arbitrarily, capriciously, or contrary to law when it excluded protestor Sev1Tech's proposal on the grounds that its total price could

---

[18] As noted above, the wording in the clarification request to AiNET varied slightly, but the two questions asked were identical.

not be determined or when it declined to engage in  clarifications with Sev1Tech regarding its proposal. Therefore, Sev1Tech's motion for judgment on the administrative record is **DENIED** and defendant's cross motion is **GRANTED**. Sev1Tech's complaint is **DISMISSED**.

The Clerk shall enter **JUDGMENTS** in case numbers 15-876C and 15-923C consistent with this opinion, dismissing both complaints.

**IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**